#30146-a-JMK
**2024 S.D. 22**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

MAX BOLDEN,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBIN J. HOUWMAN
Judge

\* \* \* \*

KRISTI JONES of
Dakota Law Firm, Prof. LLC
Sioux Falls, South Dakota

MANUEL J. de CASTRO JR
Sioux Falls, South Dakota                    Attorneys for defendant
                                             and appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

\* \* \* \*

ARGUED
JANUARY 9, 2024
OPINION FILED **04/17/24**

#30146

KERN, Justice

[¶1.]        Max Bolden shot and killed Benjamin Donahue in October 2019 outside a club in Sioux Falls.  Bolden was indicted for first-degree murder, second-degree murder, and possession of a firearm by a convicted felon.  At trial, Bolden claimed that he shot Donahue in self-defense.  At the conclusion of the State's case, and again at the close of the evidence, Bolden moved for a judgment of acquittal on the murder charges.  The circuit court denied both motions.  The jury returned a guilty verdict on the charges of first-degree murder and possession of a firearm by a convicted felon.  Bolden appeals his first-degree murder conviction on the grounds of insufficient evidence.  We affirm.

## Factual and Procedural Background

[¶2.]        Although some of the facts are disputed, "we restate the evidence and testimony 'in a light most favorable to the jury's verdict.'"  *State v. Seidel*, 2020 S.D. 73, ¶ 2, 953 N.W.2d 301, 305 (citing *State v. Huber*, 2010 S.D. 63, ¶ 2, 789 N.W.2d 283, 286).

[¶3.]        Bolden and Donahue were involved in similar social circles in Sioux Falls, South Dakota, and had a contentious relationship in the months preceding the October 26, 2019, incident.  Bolden testified that Donahue sent him a number of threatening text messages accusing him of being involved with the mother of Donahue's child.  Bolden also asserted that he had a hostile face-to-face encounter with Donahue during this time.  At trial, Bolden and several others testified that a few weeks earlier, Donahue became agitated with a group of individuals—including Bolden—while standing outside Club David, a nightclub in downtown Sioux Falls,

and brandished a gun toward the group. Bolden testified that because of this incident he had decided to avoid future contact with Donahue.

[¶4.]     In the early afternoon of October 25, 2019, Bolden and his girlfriend, Krista Kruckenberg, took their children to purchase Halloween costumes. After the family finished shopping, they went back to their home and began carving pumpkins. Bolden's brother brought his children over to participate in the activity. Once the pumpkin carving was completed, the adults cleaned up the mess and put the children to bed.

[¶5.]     Bolden was invited to Club David to celebrate a friend's birthday that night but declined because he wanted to avoid the risk of an encounter with Donahue. Instead, Bolden, Kruckenberg, and Armika Agic drove to Mitchell to see one of Bolden's friends who had invited him to hang out. They left Sioux Falls around 9:00 that evening, leaving the children at home with Kruckenberg's brother who lived with the couple. The group eventually gathered at Thirsty's, a bar in Mitchell, where they had a couple of drinks. They stayed in Mitchell for a short time before returning to Sioux Falls around midnight.

[¶6.]     Bolden, Kruckenberg, and Agic returned to Bolden and Kruckenberg's home in Sioux Falls, where they had additional drinks as they planned to stay in for the remainder of the evening. However, Bolden received a phone call and text messages from a friend who requested that he come to Club David to help resolve a dispute. One of Bolden's friends, Thomas Roberts, was being held at gunpoint in the bathroom at the club. Bolden knew the individual who pointed the gun at

Roberts and believed that, because he knew the parties involved and what the altercation was likely about, he could go down to the club and diffuse the situation.

[¶7.]    Bolden drove to the club in a white Ford Explorer, accompanied by Kruckenberg and Agic. They arrived around 1:00 a.m. and parked in the parking lot south of the club near the Carnegie building. After Bolden parked the car, he called both Roberts and the friend that had informed him of the altercation, but neither party answered. Bolden felt uneasy about the situation, so Kruckenberg handed Bolden a revolver before he got out of the car. He put the gun in his back right pocket, got out the vehicle, and started walking toward Club David. Bolden saw Roberts come out of the club and he attempted to talk to him, but Roberts waved him off, jumped in his vehicle, and drove away.

[¶8.]    Shortly after Bolden had walked across the street to Club David, Donahue pulled into the Carnegie building parking lot and parked his vehicle to the southeast of the vehicle Bolden was driving. Donahue got out of his vehicle and made his way toward the club. While Donahue was walking north toward the club, Bolden was making his way south toward the parking lot, heading in Donahue's direction. As the two men neared each other, Kruckenberg and Agic got out of Bolden's vehicle and followed behind Donahue. At that same time, Darneisha Williams, who was leaving the club, was walking toward the Carnegie building parking lot behind Bolden.

[¶9.]    Bolden and Donahue met face-to-face near the north entryway of the parking lot. At this point, Kruckenberg and Agic were approaching the men and were just a few feet away. The two men spoke for roughly ten seconds before

Bolden pulled the gun from his back pocket and shot Donahue point blank in the face between the bottom of his nose and the top of his upper lip. Donahue fell to the ground and did not move. After Bolden fired the gun, he jumped back a step and began walking in the direction of his vehicle. As he neared Donahue's body, Bolden bent over and fired a second shot into Donahue's head just above his left ear. The second shot was fired approximately five seconds after the first.

[¶10.] Bolden, Kruckenberg, and Agic walked to their vehicle, got in, and drove out of the parking lot using the east exit, heading south down South Main Avenue. Williams, who saw the entire encounter between Bolden and Donahue from a distance of approximately ten feet or less, called 911 to report the shooting. Because Williams was on probation and prohibited from going into bars, she gave a false name to the dispatcher and left the area.

[¶11.] Cody Nachreiner, an officer with the Sioux Falls Police Department (SFPD), was the first to arrive on scene and located Donahue's body. Officer Mathew Cook arrived next and entered the Carnegie building parking lot through the east entrance. After locating Officer Nachreiner and Donahue, Officer Cook began to administer CPR chest compressions on Donahue. Officer Hector Soto also arrived and helped Officer Cook render aid.

[¶12.] Shortly thereafter, emergency medical services (EMS) personnel arrived on scene and, with the help of law enforcement, moved Donahue's body onto a stretcher. The EMS personnel placed Donahue in the back of the ambulance and performed various medical interventions while transporting Donahue to Avera McKennan Hospital. Despite the efforts of hospital personnel, Donahue died at the

hospital. Because of the violent nature of his death, his body was transported to the morgue at Sanford Hospital until an autopsy could be conducted. Dr. Kenneth Snell, a forensic pathologist and the county coroner, later concluded that Donahue's death was caused by a gunshot wound to his head.

[¶13.] Approximately ten to fifteen minutes after the shooting occurred, Anthony Buss, a detective with the SFPD, arrived at the parking lot to help maintain scene security. He also assisted crime lab personnel in photographing and preserving items of evidentiary value in the area. Detective Buss looked for and identified security cameras located near the scene, namely at the intersection of 10th Street and South Main Avenue and several cameras surrounding the Carnegie building. He retrieved security footage from these cameras to aid the investigation. Although Bolden and Donahue were standing beside a vehicle that partially obscured the video footage of the shooting, Detective Buss was able to identify the white Ford Explorer that fled the scene and the color of clothing that the suspect was wearing.

[¶14.] Because many of the witnesses fled the scene after the shooting, Detective Christopher Schoepf, the lead detective on the case, began trying to identify the suspect from the video surveillance recordings. Detective Pat Mertes also helped organize the investigation and went through the video surveillance to try to identify the shooter. Brianna Anderson, a forensic specialist with the SFPD, identified and photographed areas of interest at the scene. Aside from Donahue's body and the surrounding blood and tissue present as a result of the gunshot wounds, law enforcement found a bullet fragment inside Donahue's red stocking hat

that was lying on the ground near his head. Notably, a gun was not discovered on or near Donahue.

[¶15.]     While the shooting scene was being investigated, Bolden, Kruckenberg, and Agic were driving south and west of where the shooting took place. Eventually, Bolden pulled over in a neighborhood and told Agic that he had to get out of there. He and Kruckenberg got out of the vehicle and fled on foot. Agic moved to the driver's seat, drove the vehicle to her house, and parked it in the garage.

[¶16.]     After further investigation, law enforcement identified the suspect as Bolden. He was indicted on November 13, 2019, on charges of first-degree murder (SDCL 22-16-4(1)), second-degree murder (SDCL 22-16-7), and possession of a firearm by a felon (SDCL 22-14-15). The State filed a part II information the following day, and the court issued an arrest warrant. However, Bolden was not immediately arrested because he fled the state after the shooting. He was ultimately apprehended in South Haven, Mississippi, on March 2, 2021—sixteen months after the shooting.

[¶17.]     Bolden's jury trial began on August 19, 2022. The State called fourteen witnesses during its case-in-chief, including two eyewitnesses to the shooting, Agic and Williams, law enforcement officers, lab personnel, emergency medical responders, and the forensic pathologist that performed Donahue's autopsy.[1]

---

1.     Kruckenberg was not called to testify at the trial.

[¶18.]    Agic, who testified under a grant of immunity from the State, described in detail the events leading up to, during, and after the shooting.[2] According to Agic, she rode with Bolden and Kruckenberg in Bolden's white Ford Explorer to Club David. She testified that she remained in the vehicle with Kruckenberg while Bolden went to speak to someone in the club. However, the two women got out of the vehicle after Donahue parked his vehicle and began walking toward the club. Agic heard the first gunshot just as she and Kruckenberg were walking up to Bolden and Donahue. She testified that she could see that Donahue had his hands in his pants as he approached and one hand in his pants as he exchanged words with Bolden. Agic testified that prior to the gunshot she did not see any type of physical altercation between Bolden and Donahue; "[t]hey were just in each other faces[.]" Agic recalled that Donahue fell to the ground after the first gunshot and was not moving. Bolden then approached Donahue and shot him a second time in the head. Agic testified that she never saw Donahue with a gun.

[¶19.]    Agic also testified that she left the parking lot with Bolden and Kruckenberg after the shooting and drove toward 18th Street and into a neighborhood where Bolden stopped the car. He ran from the car with Kruckenberg, leaving Agic sitting alone in the backseat. Agic testified that she drove the vehicle to her home and hid it in her garage. She admitted that later that morning, in the early hours, Kruckenberg came to her house and asked for supplies to clean the vehicle. Agic provided her with bleach and cleaning rags. Law

---

2.    The State agreed not to charge Agic with being an accessory to a felony in exchange for her cooperation during trial.

enforcement interviewed Agic on October 29, 2019, and she admitted that the vehicle was in her garage.

[¶20.]     Williams, who knew both Bolden and Donahue, testified that she was present at Club David on October 26, 2019.[3]  After she walked out of the club, she saw Bolden in front of her and followed behind him to the Carnegie building parking lot.  Williams saw Donahue walking toward the club through the parking lot and saw the two men speaking face-to-face.  She heard a brief conversation between the two men and then saw Donahue's hand go up in the air before she heard a gun go off.  Williams, who was standing in close proximity to the two men, saw Donahue immediately fall to the ground and begin to bleed from his head.  She saw Bolden holding a gun and testified that she saw Bolden stand over Donahue's body and fire the second shot into his head.  Williams said Donahue was lying on the ground and was not moving before Bolden fired the second shot.  She did not see Donahue with a gun.  She testified that she watched Bolden, Agic, and Kruckenberg leave the scene, and, although she called 911 to report the shooting, she did not stay at the site until law enforcement arrived.

[¶21.]     Dr. Snell, the Minnehaha County coroner, testified that he performed an autopsy on Donahue on October 28, 2019.  He testified that Donahue was 6'4" tall and weighed 242 pounds.  During his examination, Dr. Snell discovered two gunshot wounds to the body: one between the top of Donahue's upper lip and the bottom of his nose and one above the left ear.  Dr. Snell testified that the gunshot

---

3.     At one point during trial, Williams was held in contempt for refusing to testify.  In exchange for her testimony, the State agreed not to file a probation violation against her.

located above Donahue's lip was a contact wound, meaning the barrel of the gun was touching Donahue's lip when the gun was fired. The bullet entered the head above the lip, traveled at a slight angle and exited below the right ear. He testified that although the gunshot wound above the lip would not have immediately killed Donahue, it could have knocked him unconscious. The second shot—fired from a gun held approximately one foot from Donahue's head—entered the head above the left ear and traveled straight through Donahue's brain and exited above the right ear. Dr. Snell testified that this second shot was "an immediately fatal wound." He also indicated that in his opinion, the gunshot wounds appeared to be "consistent with [bullets fired from] a medium caliber" gun.

[¶22.]     Bolden moved for a judgment of acquittal on the murder charges at the close of the State's evidence, arguing that the State did not prove that he had the requisite specific intent to be convicted of premeditated murder. Additionally, Bolden argued that there was insufficient evidence to prove that he was acting with a depraved mind and therefore he could not be convicted of second-degree murder. The circuit court denied Bolden's motion and the defense proceeded with its case-in-chief.

[¶23.]     Bolden's defense was centered on his claim that he shot Donahue in self-defense. In support of this theory, the defense presented testimony from several individuals who knew that Donahue had a history of making threats and pulling guns on people. But Bolden first called SFPD Detective Shelly Slattery Carpenter, who testified that during the course of her investigation into the incident she reviewed Donahue's Facebook page. Detective Carpenter captured

screenshots of some of Donahue's Facebook posts from the week preceding his death. Donahue's posts, among others, included, "He ain't done with me yet………." and "In case they thought I was lying about my aim wit big birtha, so how much more dangerous am I with a hand gun when i dont have to be seen at all muffuckas betta stop playing with me. This just food for thought !" Bolden admitted these screenshots as evidence to demonstrate Donahue's aggressive and threatening behavior.[4]

[¶24.]     The defense then called Bolden to testify on his own behalf. He told the jury that his nickname was "Mini" and that he was a 39-year-old father of four who worked at a lawn care/snow removal business that he started in Sioux Falls. Bolden indicated that he was 5'7" tall and weighed around 170 pounds. He acknowledged having three prior felony convictions. Bolden testified regarding his conflictual relationship with Donahue and stated that Donahue pulled a gun on him in the weeks leading up to the shooting.

[¶25.]     On the night of the shooting, Bolden indicated that he went to Club David to help his friend, Roberts, who had been held at gunpoint in the club. When Bolden arrived, he saw Roberts come out of the club so he got out of the car and spoke with him briefly before Roberts drove off. Bolden explained that he got back in the car and told Kruckenberg that things did not "feel right," after which she handed him a gun which he placed in his back pocket. He got out of the car and

---

4.     Detective Carpenter was also present during a portion of law enforcement's interview with Williams and testified for the defense regarding several statements made by Williams that were purportedly inconsistent with her trial testimony.

walked back toward the Club where he spoke briefly to Williams in the street about what was going on with Roberts.[5]

[¶26.] Bolden testified that he started walking back to his vehicle because he wanted to go home when Donahue came out from behind a corner. Bolden said he would have continued toward his vehicle, but Donahue, who Bolden described as being as big as a bear, was directly in his path and confronted him stating, "I told you I was going to catch your a\*\*, and what did I tell you I was going to do to you when I catch you?" Bolden described the situation further stating, "And so now I am getting on my defense, because, like, I am scared. I put my hand in my pocket, in my back pocket, and we still just standing there, and then he pulls out. And so when he pulled out, I shot, and jumped back, because I feel like he going to shoot me too because he pulled his gun out. Like, I seen this man pull his gun out. And I promise to God, I am not lying, this man was trying to kill me. Like, I don't know what you all want me to do because that man was trying to kill me."

[¶27.] Bolden reiterated that Donahue had his right hand in his pocket, which made him believe that Donahue was holding a gun. When Donahue began to move his hand, Bolden explained that he thought Donahue was going to shoot him because he saw him pull a gun out, causing Bolden to reactively pull his gun from his back pocket and shoot, closing his eyes as he did so. Bolden stated that he did not see where he shot and did not know if he even hit Donahue.

---

5. This testimony is inconsistent with the video evidence shown to the jury that depicts Bolden getting out of his vehicle only once before walking toward Club David.

[¶28.]     Bolden testified that when he opened his eyes and saw Donahue down on the ground, he walked toward Donahue's hand which had a gun in it. In order to pick up Donahue's gun, Bolden testified that he switched his gun from his right hand to his left hand. Bolden stated that as he began to bend over and pick up Donahue's gun, Donahue moved. Bolden testified that he shot Donahue again, describing his actions as "out of reaction, out of fear, I just, boom." When asked if he had any alternative other than to shoot Donahue, Bolden said, "No. If I had to stay for a minute, I am shot, and I might be dead. Like, looking at it from my perspective, what else can I do? And I wasn't there for that. I didn't have no problems with him." He testified that he was not intending to kill Donahue.

[¶29.]     Bolden acknowledged that after the shooting he immediately got into his vehicle and fled the scene with Kruckenberg and Agic. When questioned about this decision he stated, "I knew I shot him, and so I got up out of there. I am going to be honest, I got up out of there." After driving some distance in the city of Sioux Falls, Bolden parked the car and left on foot with Kruckenberg, later calling his brother to pick him up. Bolden testified that he headed for Chicago, Illinois, and dumped the gun in a trash can somewhere along the way. While Bolden said he thought about turning himself in during the sixteen months he was gone, he testified that he knew he would go to jail regardless of whether he was acting in self-defense.

[¶30.]     Bolden then called a number of witnesses who testified, in varying degrees, that Donahue had an aggressive and threatening demeanor and generally carried a gun on his person. Roberts testified that Bolden had previously shown

him text messages from Donahue, recalling one message which stated, "I am popping you're a\*\* on sight, I don't care if you with your kids or your girl." Roberts said Donahue accused Bolden of "messing" with the mother of Donahue's child and made similar threats to "[p]lenty of people." On cross-examination, Roberts admitted that he didn't "know [Donahue] personally. I never dealt with this guy." Roberts also described the altercation at Club David that prompted Bolden to drive to the club to try to help him.

[¶31.] Bolden next called Anthony Smith, a convicted felon who testified via Zoom from Lubbock, Texas. Smith described three prior occasions where Donahue pulled a gun on him. The first incident occurred at a barber shop and Smith testified that Donahue threatened him with a .45 and held the gun to his throat. Smith indicated that he reported this incident to the police department but never told Bolden that Donahue had threatened him.[6]

[¶32.] Bolden also called Eugene Nave, a three-time convicted felon known as "Pumpkin," who testified that Donahue originally had a "beef" with him which led to a fight. Nave indicated that he pulled a gun on Donahue before Donahue could pull one on him. According to Nave, Donahue also had issues with Bolden.

[¶33.] Bolden also called William Campbell, a convicted felon, who testified that he was at Club David the morning of October 26, 2019, but did not see the

---

6. These specific instances of conduct by Donahue were admitted, without objection, despite the testimony that Bolden was not aware of them. *See State v. Knecht*, 1997 S.D. 53, ¶ 15, 563 N.W.2d 413, 419 (holding that a defendant who was not aware of specific instances of violent conduct by the alleged victim could not use such instances to show that his fear of the victim was reasonable).

shooting. Campbell stated that he contacted Bolden earlier that night about coming to the club, but he knew Bolden would not come down because Bolden was "staying in the house a lot lately" trying "to avoid [Donahue]." Campbell testified that he was the person who sent Bolden the text message that morning telling him that Roberts was being held at gunpoint in the bathroom. Campbell also described a situation several weeks before the shooting where he, Bolden, and a group of friends were attempting to joke with Donahue in front of the club. According to Campbell, Donahue lifted his shirt, revealed a gun tucked in his pants, and told the group to get away from him.

[¶34.] Josh Durrah testified about Donahue's jealousy. Durrah reported that Donahue believed that both he and Bolden were sleeping with Donahue's girlfriend. Durrah stated that a few weeks before the shooting, he was driving in Sioux Falls when Donahue pulled up beside his car, brandished a gun at him, and followed him around town. Durrah testified that he told Bolden of this encounter with Donahue.

[¶35.] Bolden also called David Moore, a convicted felon and friend of both Bolden and Donahue. Moore was with Bolden in front of Club David several weeks before the shooting when Donahue showed the group a gun. Moore testified that Donahue pulled the gun out of his pocket, cocked it, and held it in front of him telling the group to get away from him. Moore was unaware that Bolden and Donahue had been having any kind of dispute.

[¶36.] Bolden's final witness was Savannah Hernandez. Hernandez testified that she was a Facebook and Snapchat friend with Donahue and that a week or two before the shooting Donahue "was on live Facebook very aggressively threatening

multiple people within a group of friends." This friend group included Bolden. Hernandez said Donahue was "[t]hreatening to shoot them. Threatening to pull up on families. Come to people's houses. It was like a lot of just anger." She said Donahue also posted videos of him "driving around talking about looking for different people." While Hernandez was not at Club David the morning of the shooting, she became aware of the shooting from a Snapchat video posted by a friend. She said the video showed "a ton of people around jumping back and forth over the body, moving around. It was just a lot of different people everywhere."[7] She did not see Donahue with a gun in the video, but she testified that she could "guarantee somebody grabbed the gun" because she had "never *not* seen [Donahue] with a gun." (Emphasis added). She further explained that it was her opinion that the gun was likely unregistered, which would mean that, knowing the group of people that Donahue hung around with, somebody would have picked up the gun.

[¶37.] After the defense rested, the State called one witness in rebuttal. Thereafter, Bolden renewed his motion for judgment of acquittal, asserting that "no reasonable jury, based on the fact that the State has the burden of proof, beyond a reasonable doubt, [could find] that he didn't act in self-defense, that no reasonable jury could convict him on these charges." The circuit court denied Bolden's motion and the case was submitted to the jury for deliberation. The jury found Bolden guilty of first-degree murder and possession of a firearm by a felon. The court

---

7. Bolden did not introduce, and the record does not include, the Snapchat video purportedly showing people hopping over Donahue's body. Hernandez was the only individual to testify about such facts.

sentenced Bolden to life in prison on the first-degree murder charge and thirty-five years for possession of a firearm by a felon, with credit for time served.

[¶38.] Bolden appeals and raises one issue, which we restate as follows:

1. Whether the circuit court erred when it denied Bolden's motions for judgment of acquittal.

## Standard of Review

[¶39.] "We review a denial of a motion for judgment of acquittal de novo." *Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d at 313 (citation omitted). "In measuring the sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83). We "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* (citation omitted). Instead, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Id.* (citation omitted). "It is the jury's responsibility, not ours, 'to decide what conclusions should be drawn from evidence admitted at trial.'" *State v. Strozier*, 2013 S.D. 53, ¶ 24, 834 N.W.2d 857, 865 (citation omitted). "Moreover, the jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d at 313 (omission in original).

## Analysis

*1. Whether the circuit court erred when it denied Bolden's motions for judgment of acquittal.*

[¶40.] Bolden was convicted of first-degree murder pursuant to SDCL 22-16-4(1), which defines the offense as: "Homicide is murder in the first degree: (1) If

perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being, including an unborn child[.]" Bolden claims on appeal that the "[e]vidence at trial was insufficient to sustain a conviction of murder in the first degree" and that the circuit court erred when it denied his motions for judgment of acquittal. He presents two primary arguments in support of his claim. First, he contends the State failed to prove beyond a reasonable doubt that he was not acting in self-defense, and second, he asserts the State failed to prove that he acted with the premeditation necessary to support a first-degree murder conviction. After reviewing the record, we find sufficient evidence in the record to sustain the conviction.

[¶41.] "When a homicide defendant raises self-defense or justification, the State must prove beyond a reasonable doubt that the killing was without authority of law." *State v. Smith*, 2023 S.D. 32, ¶ 48, 993 N.W.2d 576, 592 (citation omitted). SDCL 22-18-4.1 provides that: "A person is justified in using or threatening to use deadly force if the person reasonably believes that using or threatening to use deadly force is necessary to prevent imminent death or great bodily harm to himself, herself, or another, or to prevent the imminent commission of a forcible felony." Further, "[a] person who uses or threatens to use deadly force in accordance with this section does not have a duty to retreat and has the right to stand his or her ground, if the person using or threatening to use the deadly force is: (1) Not engaged in a criminal activity, and (2) In a place where the person has a right to be." SDCL 22-18-4.1(1)-(2).

[¶42.]        Bolden first argues that he "was justified in his use of force" and that "[he] was permitted by statute to use deadly force to protect himself because he was not engaged in criminal activity and was in a place he had a right to be."  However, this argument disregards the requirement that a person must "reasonably believe[ ]" that "deadly force is necessary to prevent imminent death or great bodily harm[.]"  *See id.*  Therefore, Bolden must have had a reasonable belief that Donahue was about to severely injure or kill him.  In this regard, Bolden contends that his actions were reasonable because he was "confronted on a street in the early morning hours by a man hellbent on revenge and armed with a deadly weapon[.]"  As such, Bolden claims it was "reasonable for [him] to believe that his only option to prevent his own imminent death was to use a deadly weapon himself."

[¶43.]        With respect to Bolden's belief that Donahue was going to hurt or kill him, Bolden testified that in the moments leading up to the first gunshot Donahue confronted him and said, "I told you I was going to catch your a**, what did I tell you I was going to do to you when I catch you?"  He also said that Donahue had his hands in his pockets and Donahue was known to carry a gun on his person.  However, the State presented evidence to prove Bolden was not acting in self-defense.  Williams testified that she heard Donahue say, "Maybe we should just quash this[.]"  When asked what "quash" meant, Williams responded, "Like leave it alone or something."  Further, Williams said that Donahue did not display any aggressive actions toward Bolden and she did not see Donahue with a gun.

[¶44.]        In justifying the second shot, Bolden testified that, although Donahue fell to the ground after the first shot, he was uncertain if the first gunshot even hit

Donahue because he did not see any blood. Bolden testified that, in his view, he still believed Donahue could have been a threat. Bolden stated Donahue's body moved when he reached down to retrieve Donahue's gun from his hand: "And then [Donahue] lunged, jumped - - his body jumped, and I shot again." Bolden said the second gunshot was a reaction based on fear.

[¶45.]      Regardless, the State offered evidence to prove Bolden did not act in self-defense with respect to the second gunshot. Williams testified that after the first shot she saw Donahue fall to the ground and saw blood coming from his head. She told the jury that she did not see Donahue holding a gun, nor did she see Donahue's body move after he fell to the ground. She recalled that Bolden shot once and then shadowed over Donahue's body before he shot again. Similarly, Agic testified that Donahue fell to the ground after the first gunshot and did not move before Bolden shot again. Agic said that she did not see Donahue with a gun and there was no physical altercation between the two men leading up to the shooting.

[¶46.]      On appeal, Bolden neglects to address or negate the substance of Agic and Williams's testimony. Rather, he attempts to lessen their credibility as witnesses—a tactic immaterial to our analysis on review. Williams and Agic's credibility is a determination left to the trier of fact. Their testimony gave the jury sufficient evidence to conclude that Bolden's actions were not in self-defense, and Bolden has not refuted that evidence aside from his own testimony and attacking the witnesses' credibility on cross-examination.

[¶47.]      The State also offered into evidence the surveillance videos from the shooting, which importantly show the close proximity of the witnesses to the two

men. Although the view of the initial confrontation and gunshots is substantially blocked by a parked car, the video showed Donahue and Bolden approach one another, talk to each other for roughly ten seconds, and then Bolden jump back after the first gunshot. The video then shows Bolden moving toward Donahue's head, bending over the place where Donahue's body was lying, and then walking to his vehicle before he left the scene. Upon consideration of the testimony and exhibits contained within the record, we conclude there is sufficient evidence in the record for a rational trier of fact to have determined that Bolden was not acting in self-defense and that the killing was without authority of the law.

[¶48.] Yet, Bolden claims in his reply brief that the circuit court erred in denying his motions for judgment of acquittal because "there was no testimony, nor evidence, that Bolden [shot the gun] with a premeditated design to effect the death of Donahue." Bolden's claim is unpersuasive.

[¶49.] We have recognized that "'[p]remeditated design to effect death' is . . . an intention, purpose, or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed." *State v. Krueger*, 2020 S.D. 57, ¶ 22, 950 N.W.2d 664, 671; *see also* SDCL 22-16-5. "Premeditation may be inferred from the facts and circumstances surrounding the murder." *State v. Derek at the Straight*, 2023 S.D. 1, ¶ 24, 984 N.W.2d 715, 720–21 (citation omitted). "The significant factors to be considered in determining premeditation include: [1] the use of a lethal or deadly weapon, [2] the manner and nature of the killing, [3] the

defendant's conduct before and after the murder, and [4] the determination of the presence or absence of provocation." *Id.* at 721 (alterations in original).

[¶50.]      Aside from attempting to discredit the State's witnesses, Bolden argues only that he did not have the requisite specific intent to be convicted of first-degree murder. He claims that he did not have "a premeditated design to kill Donahue as he didn't even know he'd see Donahue that evening, let alone intend to kill him, nor did he intend to kill him when he did see him [in the parking lot][.]" In so arguing, Bolden ignores the reality that "[a] premeditated design to effect death sufficient to constitute murder may be *formed instantly before* committing the act." *Krueger*, 2020 S.D. 57, ¶ 22, 950 N.W.2d at 671 (emphasis added); *see also* SDCL 22-16-5. Even if Bolden drove to Club David without the intent to kill Donahue, he could have, as a matter of law, formed such intent in the seconds before he fired the gun.

[¶51.]      It is well-settled that "we will not set aside a jury verdict unless 'the evidence and all reasonable inferences to be drawn therefrom fail to sustain a rational theory of guilt.'" *Seidel*, 2020 S.D. 73, ¶ 36, 953 N.W.2d at 314. Apart from his own testimony, Bolden fails to refute the State's evidence of premeditation. The record includes evidence that showed Bolden used a gun to shoot Donahue point blank in the face. He did so without provocation, as there was evidence introduced that Donahue told Bolden right before the shooting that they should put their bad history behind them. Even setting aside the first shot, the delivery of the second shot as described by Agic and Williams, and supported by the surveillance video, reveals that Bolden bent low over Donahue's body just before he fired another

round. Both witnesses testified that they saw Bolden shoot Donahue a second time in the head while Donahue was lying on the ground bleeding, motionless, and unarmed. Bolden then immediately left the scene, fled the state, went on the run for nearly a year-and-a-half, and disposed of the gun used to shoot Donahue somewhere between Sioux Falls and Chicago.

[¶52.] The jury considered the credibility and demeanor of Agic, Williams, and Bolden and the witnesses he called in his defense. The circuit court gave the jury seven instructions properly setting out the law of self-defense. It was ultimately the responsibility of the jury to evaluate the evidence presented. It is not within our province to "reweigh evidence or pass on the credibility of witness testimony." *Id.* ¶ 39, 953 N.W.2d at 315. Based on our review of the record there is sufficient evidence to permit a rational trier of fact to conclude that the essential elements of first-degree murder were established beyond a reasonable doubt.

[¶53.] Affirmed.

[¶54.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.