#31107-a-MES
**2026 S.D. 36**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

DERREK RYAN BRAVEHEART,                    Defendant and Appellant.

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

THE HONORABLE JOSHUA HENDRICKSON
Judge

BRYAN T. ANDERSEN of
Pennington County Public
   Defender's Office
Rapid City, South Dakota                    Attorneys for defendant and
                                     appellant.

MARTY J. JACKLEY
Attorney General

RENEE STELLAGHER
ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
                                     appellee.

CONSIDERED ON BRIEFS
JANUARY 12, 2026
OPINION FILED **06/10/26**

#31107

SALTER, Justice

[¶1.]      Derrek Braveheart was charged with murder and manslaughter for shooting and killing Johnathan Odom.  Before trial, Braveheart moved to dismiss the charges, arguing he acted in self-defense and seeking immunity under SDCL 22-18-4.8.  The circuit court denied the motion after finding the State overcame Braveheart's prima facie claim of immunity by clear and convincing evidence.  At trial, Braveheart argued the killing was justified because he acted in self-defense.  The court denied his motion for judgment of acquittal, and the jury convicted him of first-degree manslaughter in violation of SDCL 22-16-15(3).  Braveheart appeals, claiming the court clearly erred when it denied his pretrial motion to dismiss on the basis of immunity and erred when it denied his motion for judgment of acquittal.  We hold that the former question is rendered moot by a final judgment of conviction and affirm.

### Factual and Procedural History

[¶2.]      Braveheart and his then-girlfriend, Ayiannah Carroll, went to a Family Dollar store in Rapid City on February 2, 2024.  Braveheart parked his truck in front of the store.  To the driver's side of the truck was a vehicle operated by Johnathan Odom, who was unknown to both Braveheart and Carroll.  Braveheart waited in the truck while Carroll went inside the store.

[¶3.]      At some point, Braveheart saw Odom adding windshield washer fluid to his vehicle.  Odom appeared agitated and threw the empty washer fluid container at the store before going inside.  Around the same time, Carroll rejoined Braveheart in the truck.

[¶4.]     Odom soon left the store and approached the driver's side door of Braveheart's truck, where he began yelling at Braveheart and raising his arms in the air. At trial, Braveheart testified that he rolled down his window because he was unable to hear what Odom was saying.

[¶5.]     According to Braveheart, Odom complained that Braveheart had stared at him when he tossed the washer fluid container at the store. As Odom yelled at Braveheart, Carroll testified that she told Braveheart the two should leave. At trial, Braveheart disputed Carroll's testimony that she suggested leaving.

[¶6.]     Bystanders Andrew Schurger and Krista Lee noticed the confrontation and watched as the sequence of events unfolded. Schurger too had seen Odom throw the washer fluid container, and Lee later testified that Odom appeared agitated.

[¶7.]     Schurger and Lee saw Odom reach inside of Braveheart's truck and, according to Schurger, "open-handedly . . . smack[] [Braveheart] in the face." At trial, Schurger testified that Odom appeared as though he "was looking for a fight." Schurger called 911 to report what he believed to be an imminent confrontation. Lee testified that Odom slapped Braveheart once more before Braveheart got out of his truck to face Odom.

[¶8.]     According to Braveheart, Odom opened the driver's side door, but Carroll had a different recollection and testified at trial that Braveheart opened the door himself. Regardless, the other witnesses agreed that he got out of his vehicle willingly. As he did, Braveheart took with him his lawfully concealed handgun.

Around this time, Carroll began video recording Braveheart's confrontation with Odom on her cell phone.

[¶9.] Once outside of the truck, Braveheart chambered a round in his handgun to "show [Odom] that it was a real gun and that it was serious." Despite this, Odom once again slapped Braveheart's face. At trial, Schurger testified that after this slap, Braveheart turned to Schurger and asked if Braveheart "was in the wrong." Schurger answered "No," but added he did not see the gun in Braveheart's hand. According to Lee, Braveheart never appeared to be in fear.

[¶10.] Odom slapped Braveheart a fourth time in what Lee and Schurger both described as the hardest slap. Odom then took a couple of steps back, away from Braveheart and raised his arms in the air at shoulder height and told Braveheart, "shoot me then." After approximately three seconds, Braveheart raised his gun and shot Odom one time in the chest. Lee estimated the two were six to seven feet apart at the time of the shooting, though a Family Dollar employee placed the distance at less than two feet.

[¶11.] The video recording from Carroll's phone confirmed the eyewitnesses' statements. The sixty-eight-second video begins with Braveheart standing outside his truck holding his handgun and asking Odom, "[y]ou know I'm in the right . . . ?" Next, Odom approaches Braveheart, pushes him, attempts to make contact with his head, and says, "[g]et the fuck away from me." In response, Braveheart raises his handgun in Odom's direction and says, "[y]ou're about to get your ass blown . . . ." Odom steps backwards away from Braveheart, raises his outstretched arms and says, "[s]hoot me then." Odom steps forward and slaps Braveheart a fourth time

before again stepping backwards, this time out of the camera's view, and says, "[w]hat you going to do, shoot me then?"

[¶12.] Seconds later, Braveheart raises his handgun and fires a single shot into Odom's chest. Odom reappears in the video, stumbling away and calling out in apparent disbelief. Across the parking lot, Braveheart yells to Odom, "[t]old your ass. . . . You think you can come up and slap me like I'm some bitch . . . ?"

[¶13.] Paramedics arrived shortly after the shooting and transported Odom to a nearby hospital, where he died from the gunshot injury. An autopsy revealed that Odom had a blood alcohol content of .104% when he died.

[¶14.] Officers from the Rapid City Police Department also responded to the scene. Braveheart complied with their orders; he relinquished his handgun and sat in a police car while the officers conducted a preliminary investigation, which included collecting witness statements, taking photographs, and viewing Carroll's video. Braveheart was not immediately arrested and was eventually allowed to leave the scene.

[¶15.] A Pennington County grand jury indicted Braveheart with one count of second-degree murder in violation of SDCL 22-16-7, and, in the alternative, three counts of first-degree manslaughter in violation of SDCL 22-16-15(2), (3), and (4).[1] Braveheart pled not guilty and filed a pretrial motion to dismiss the indictment, claiming self-defense immunity under SDCL 22-18-4.8 and asserting that "Odom

---

1. Before trial, the State voluntarily dismissed count two, manslaughter in the first degree in violation of SDCL 22-16-15(2).

. . . unlawfully enter[ed] Braveheart's occupied vehicle and [struck] Braveheart causing him to stand his ground in self-defense . . . ."

[¶16.]    The State resisted Braveheart's motion, and the circuit court conducted an evidentiary hearing on the question of statutory immunity. The State called Lee, Schurger, and Carroll, as well as an additional eyewitness, who stated that, while she did not see Odom hit Braveheart, she did not believe Braveheart acted in self-defense, opining, "I don't think he was in danger." The State also introduced Carroll's cell phone video into evidence through the testimony of Detective Matthew Almeida. Braveheart did not testify at the hearing.

[¶17.]    The circuit court subsequently entered written findings of fact and conclusions of law, denying Braveheart's motion for statutory immunity. The court found that Carroll told Braveheart they should leave and that it was "uncontested that Odom entered the vehicle when he smacked [Braveheart] through the driver's side window." The court also concluded that under SDCL 22-18-4.3, Braveheart was "presumed to have had a 'reasonable fear of imminent peril of death or great bodily harm'" because Odom entered the vehicle. However, the court found that the State rebutted Braveheart's prima facie showing by clear and convincing evidence, finding that "any threat of harm had dissipated" by the time Braveheart shot Odom.

[¶18.]    The case was tried to a jury over the course of three days. The State's evidence was consistent with the evidence it presented at the earlier immunity hearing, though more comprehensive and included, among other things, Carroll's cell phone video.

[¶19.] At the close of the State's case-in-chief, Braveheart moved for judgment of acquittal. In an oral ruling, the circuit court denied Braveheart's motion, finding that "viewed in the light most favorable to the State . . . there's been enough evidence presented to satisfy the elements of each [crime] that a reasonable juror may find enough evidence presented to reach a verdict of guilty should they believe the evidence essentially."

[¶20.] Although Braveheart did not present any evidence at the immunity hearing, he did present a defense case at trial, including his own testimony. Braveheart told the jury that he went to the Family Dollar store and waited in his truck while Carroll went inside. He testified that he made eye contact with Odom before Odom threw the empty container at the store. A short while later, Odom appeared at his truck door yelling. Braveheart explained he could not understand Odom through the closed window and recalled that after rolling it down, Odom yelled at him for staring and called him a racial slur.

[¶21.] Braveheart also testified that Odom reached into the truck multiple times, punching—not slapping—him. He said that Odom opened his truck door, and he responded by grabbing his gun as he got out. Braveheart told the jury that when the two were outside of the truck, Odom "gave [him] a really hard slam to the side of [his] head," which Braveheart claimed caused him to lose his bearings and made his vision black and blurry. On cross-examination, Braveheart disputed that the cell phone video captured the distance between himself and Odom at the time he fired his gun.

[¶22.]        The defense also called three law enforcement officers, including Detective Justin Gizzi, the lead investigator, who interviewed Braveheart after the shooting.  Through Detective Gizzi, the defense elicited testimony concerning Odom's larger size compared to Braveheart.  Detective Gizzi recounted that in the video Braveheart could be seen initially in a "defensive stance," while Odom was in a "fighting stance."  Detective Gizzi testified that in his recollection of the video, Odom slapped Braveheart after Braveheart attempted to back Odom away from him.  Detective Gizzi further testified that he observed minor injuries to Braveheart's face.

[¶23.]        The jury returned a verdict finding Braveheart guilty of first-degree manslaughter in violation of SDCL 22-16-15(3).  The circuit court sentenced Braveheart to thirty years in prison.

[¶24.]        Braveheart appeals, raising two issues, which we restate as follows:

>    1.    Whether the circuit court clearly erred by denying
>          Braveheart's motion to dismiss on the grounds of
>          statutory immunity.
>
>    2.    Whether the circuit court erred when it denied
>          Braveheart's motion for judgment of acquittal.

[¶25.]        After submission of the case, we ordered supplemental briefing to address the following question:

> Whether a claim of error relating to the pretrial immunity
> hearing under SDCL 22-18-4.8 becomes moot after a defendant
> is tried and ultimately has been convicted of the charge beyond a
> reasonable doubt at trial.  *See Wood v. People*, 255 P.3d 1136,
> 1142 (Colo. 2011); *Todd v. State*, 342 So. 3d 602, 607 (Ala. Crim.
> App. 2021).

[¶26.]    Under the circumstances, we consider the sufficiency of the evidence challenge to Braveheart's conviction first and leave for later discussion the justiciability of his appellate claims regarding statutory immunity.

## Analysis and Decision

### *Sufficiency of the evidence*

[¶27.]    "A motion for judgment of acquittal attacks the sufficiency of the evidence, which is a question of law" regardless of when the motion is considered. *State v. Ahmed*, 2022 S.D. 20, ¶ 14, 973 N.W.2d 217, 221 (citation modified).  "We review a denial of a motion for judgment of acquittal de novo."  *State v. Hillyer*, 2025 S.D. 30, ¶ 21, 23 N.W.3d 782, 789 (citation modified).

[¶28.]    "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (citation modified).  We "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* (citation omitted).  "Instead, we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict."  *Id.* (citation modified).  "It is the jury's responsibility, not ours, to decide what conclusions should be drawn from evidence admitted at trial."  *Id.* (citation modified).

[¶29.]    The first-degree manslaughter theory set out in SDCL 22-16-15(3) required the State to prove beyond a reasonable doubt that Braveheart killed Odom "[w]ithout any design to effect death . . . but by means of a dangerous weapon." Because Braveheart raised a self-defense claim, the State also needed to "prove

beyond a reasonable doubt that the killing was without authority" or justification. *State v. Bolden*, 2024 S.D. 22, ¶ 41, 6 N.W.3d 238, 247 (citing *State v. Smith*, 2023 S.D. 32, ¶ 48, 993 N.W.2d 576, 592). "Whether, under the particular facts of each case, homicide was justified is for the jury to decide." *State v. Frias*, 2021 S.D. 26, ¶ 29, 959 N.W.2d 62, 70 (citation omitted).

[¶30.]     On appeal, Braveheart focuses on the State's obligation to establish that he was not acting in self-defense when he shot and killed Odom:

> [T]he record is utterly devoid of any evidence that Odom did not enter or continually attempt to enter Braveheart's vehicle. The jury was instructed that Odom was to be presumed to be entering the occupied vehicle with the intent to commit and [sic] unlawful act involving force or violence. . . . The record is utterly devoid of any evidence that Odom was not committing or had not committed a forcible felony.

[¶31.]     To understand this argument and the instructions it references, it is helpful to review the current rules relating to self-defense justification.

### a.     The self-defense statutory framework

[¶32.]     Before 2021, South Dakota's self-defense statutes, as they relate to the use of deadly force, were codified at SDCL 22-16-34 and -35 and were referenced under the topical heading of justifiable homicide.

[¶33.]     However, in 2021, the Legislature enacted HB 1212, which was titled "An Act to clarify the use of force" (the 2021 Act or the Act). 2021 S.D. Sess. Laws ch., 93. This Act repealed SDCL 22-16-34 and -35 and replaced them with a new statutory self-defense scheme, which has been codified at SDCL 22-18-4 through 22-18-4.9. As it relates to this case, the 2021 Act implemented four key changes.

[¶34.] First—as we discuss below—the Legislature provided individuals statutory immunity from criminal prosecution and civil liability when they lawfully used or threatened to use self-defense. SDCL 22-18-4.8. As we explained in *Smith*, "SDCL 22-18-4.8 is more than just an affirmative defense to a crime; the immunity afforded by the statute is a legislative determination that justifiable homicide is not a crime subject to prosecution." 2023 S.D. 32, ¶ 30, 993 N.W.2d at 587.

[¶35.] Second, the Act redefined when deadly force could be used in the defense of person or property. Under the former, now repealed justifiable homicide statutes, deadly force was permitted to defend oneself, other specified persons, or property under the following circumstances:

> (1) **SDCL 22-16-34. Justifiable homicide—Resisting attempted murder—Resisting felony on person or in dwelling house.** Homicide is justifiable if committed by any person while resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person is.

> (2) **SDCL 22-16-35. Justifiable homicide—Defense of person—Defense of other persons in household.** Homicide is justifiable if committed by any person in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant if there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished.

[¶36.] At first glance, the plain language of these statutes would seem to sanction a broad and disproportionate statutory justification to kill when defending oneself or another. For instance, SDCL 22-16-34's use of "any felony" appears to authorize the use of deadly force "by any person while resisting any attempt . . . to

commit *any felony* upon him or her, or upon or in any dwelling house in which such person is." (Emphasis added.)

[¶37.] However, in *State v. Pellegrino*, we rejected that argument and held that SDCL 22-16-34, "obviously codifies the common law and therefore must be read in comprehension of it and our other statutes controlling the use of deadly force." 1998 S.D. 39, ¶ 10, 577 N.W.2d 590, 594. Drawing on historical context, we set forth the common law rule "that [the] use of lethal force to prevent a felony was only justified if the felony was a 'forcible and atrocious crime.'" *Id.* ¶ 14, 577 N.W.2d at 596 (citation modified). We noted that failing to interpret the statutory text in this way would create an irrational rule under which "one might justifiably be shot while forging a check in someone's home." *Id.*

[¶38.] Additionally, though admittedly absent from its text, we read a necessity component into SDCL 22-16-34. 1998 S.D. 39, ¶¶ 15–16, 577 N.W.2d at 596–97. Relying on SDCL 22-16-34's common-law ancestry and cases from "[o]ther jurisdictions with identical or nearly identical statutes," we determined that SDCL 22-16-34 only permits the use of "deadly force if such force appears *reasonably necessary*" to abate the threat. *Id.* ¶ 16, 577 N.W.2d at 596 (emphasis added). We reasoned that such a limitation was warranted because "people 'do not hold their lives at the mercy of unreasonable fears or excessive caution of others, and if from such motives human life is taken, there is no justification.'" *Id.* ¶ 16, 577 N.W.2d at 597 (quoting *Harris v. State*, 104 So. 2d 739, 743 (Fla. Dist. Ct. App. 1958)).

[¶39.] By repealing SDCL 22-16-34 and enacting a new statutory scheme for the defense of persons and property, *see* SDCL 22-18-3.1 and 22-18-4 through -4.9,

the Legislature codified many of the justification and proportionality principles that had previously existed only in our case law. For instance, SDCL 22-18-4 through -4.9 uses the more precise "forcible felony" as a basis for justification, instead of the former "any felony" text. A forcible felony is defined under SDCL 22-18-3.1(3) as "arson, assault, burglary, kidnapping, manslaughter, murder, rape, and robbery, and any other felony that involves the use of or the threat of physical force or violence against a person."

[¶40.] And the necessity requirement is now made textually explicit within the statutes themselves. Under the provisions of SDCL 22-18-4.1 and SDCL 22-18-4.2, a person using deadly force must "*reasonably believe*[] that using or threatening to use deadly force is *necessary* to prevent imminent death or great bodily harm . . . or to prevent the imminent commission of a forcible felony." (Emphasis added); *see also* SDCL 22-18-4.7 (requiring a reasonable belief that "deadly force is necessary to prevent the imminent commission of a forcible felony" when defending property other than a dwelling).

[¶41.] Third, the Act created two different presumptions that relate to an individual's initial burden of proving that their use or threatened use of force was justified. In SDCL 22-18-4.3, the Legislature created a presumption of "reasonable fear of imminent peril of death or great bodily harm" that an individual claiming immunity may invoke under certain limited circumstances:

> For purposes of § 22-18-4.2, a person is presumed to have held a reasonable fear of imminent peril of death or great bodily harm, to himself, herself, or another, when using or threatening to use defensive force that is intended or likely to cause death or great bodily harm if:

> > (1) The person against whom the defensive force was used or threatened:
> >
> > > (a) Was in the process of unlawfully entering a dwelling, residence, or occupied vehicle;
> > > (b) Had unlawfully entered, a dwelling, residence, or occupied vehicle; or
> > > (c) Had removed or was attempting to remove another against the other's will from a dwelling, residence, or occupied vehicle; and
> >
> > (2) The person who uses or threatens to use defensive force knew or had reason to believe that an unlawful entry or an unlawful and forcible act was occurring or had occurred.

SDCL 22-18-4.3.

[¶42.]     Importantly, while this statute provides a presumption of "reasonable fear," it does so "[f]or the purposes of § 22-18-4.2."[2] *Id.* And though the statute enumerates occupied vehicles within its subsections, the same cannot be said for SDCL 22-18-4.2, which is limited to dwellings and residences. Thus, on its face, the statutory presumption of reasonable fear is not applicable to the use of deadly force in defense of an occupied vehicle that does not also meet SDCL 22-18-3.1's definition of dwelling or residence.

[¶43.]     The second presumption the Legislature created can be found under SDCL 22-18-4.5. This presumption attributes to an individual "who unlawfully enters or attempts to enter a person's dwelling, residence, or occupied vehicle . . . the intent to commit an unlawful act involving force or violence." SDCL 22-18-4.5.

---

2.     The legislatures of Florida and South Carolina have enacted similar self-defense immunity legislation. These versions, however, do not limit the application of the presumption of reasonable fear to their section 4.2 equivalent. *See* Fla. Stat. Ann. § 776.013 (West 2017) and S.C. Code Ann. § 16-11-440 (2006).

Notably, this presumption is not limited to SDCL 22-18-4.2 in the same way as SDCL 22-18-4.3.

[¶44.] Lastly, the 2021 Act provided a statutory right to stand your ground. Although we have long recognized and instructed juries that an individual is not required to retreat and, in fact, has a right to stand their ground when they are lawfully exercising their right to self-defense, *see, e.g.*, *State v. Burtzlaff*, 493 N.W.2d 1, 8 (S.D. 1992) (stating that the circuit "court properly instructed the jury that [the defendant] had the right to stand her ground"),[3] the Act provided statutory guidance on when the right to stand your ground applies, *see, e.g.*, SDCL 22-18-4.1 ("A person who uses or threatens to use deadly force in accordance with this section does not have a duty to retreat and has the right to stand his or her ground, if the person using or threatening to use the deadly force is: (1) Not engaged in criminal activity; and (2) In a place where the person has a right to be.").

[¶45.] While the 2021 Act created a statutory right of immunity alongside the defense of justification, SDCL 22-18-4.1 and subsequent sections are a return to the common law's bedrock principles of self-defense. With these principles in mind, we turn to Braveheart's use of deadly force mapped on to the current statutes.

   b. *Braveheart's argument*

[¶46.] Braveheart's challenge to the sufficiency of evidence supporting his conviction is unsustainable, both factually and legally. The argument is legally

---

3. *See* S.D. Pattern Jury Instr. Crim. 2-9-2 (2023 ed.) (instruction last revised 1998) (noting under the committee comment how the no-duty-to-retreat instruction was "derived from former Instruction 2-14-9a which existed prior to 1970").

dependent on a presumption described in jury instruction 31, but Braveheart

overreads the rule and the statute on which it is based.

[¶47.]        Instruction 31 is derived from SDCL 22-18-4.5, which provides:

> A person who unlawfully enters or attempts to enter a person's
> dwelling, residence, or occupied vehicle is presumed to be doing
> so with the intent to commit an unlawful act involving force or
> violence.

[¶48.]        Using the "occupied vehicle" text, the circuit court instructed the jury

that it could presume a person "who unlawfully enters or attempts to enter

another's occupied vehicle is presumed to be doing so with the intent to commit *an*

*unlawful act involving force or violence*." (Emphasis added.) From this, Braveheart

argues that "[t]he record is utterly devoid of any evidence that Odom was not

committing or had not committed a forcible felony." This argument equates the

presumed intent to commit an "unlawful act involving force or violence" with a

forcible felony as a means of justifying the use of deadly force against Odom. But

this is not accurate.

[¶49.]        First and foremost, a forcible felony must, naturally, be a felony.

Simply put, the presumption under SDCL 22-18-4.5 that an individual who

unlawfully enters an occupied vehicle does so with the "intent to commit an

unlawful act involving force or violence" is not equivalent to SDCL 22-18-3.1's

requirement of "any other felony that involves . . . physical force or violence."

Braveheart has not identified a predicate felony under this catchall provision or

among SDCL 22-18-3.1's enumerated forcible felonies.

[¶50.]        Burglary seems the most likely candidate, but South Dakota does not

have a statute punishing burglary of an occupied vehicle, as such. However, SDCL

22-32-19 sets out the offense of aggravated criminal entry of a motor vehicle for "[a]ny person who forcibly enters a motor vehicle with intent to commit any crime in that motor vehicle . . . ." Aggravated criminal entry of a motor vehicle is a Class 6 felony, but it could not serve as a forcible felony here because under no view of the evidence did Odom *forcibly* enter Braveheart's vehicle; he easily reached into it through an open window.[4]

[¶51.] In his closing argument, Braveheart's counsel suggested that Odom had committed a felony by reaching into Braveheart's vehicle—which we now know was not correct—and also made fleeting references to other felonies that were not otherwise developed or explained through instructions:

> Entry into an occupied motor vehicle would be a forcible felony. Robbery would be a forcible felony. Odom could have continued to strike at and take [Braveheart's] weapon from his person. Theft of a firearm is also a felony. [Braveheart] does not have to wait to see whether Odom had other slaps that would produce this.
>
> Aggravated assault, imminent forcible felony if it had rose [sic] to the level of serious. Broken bones, cut face, knocked unconscious. Serious bodily injury means an injury which is grave and not trivial, in [sic] which gives rise to apprehension of danger of life, health, or limb. Injury which gives rise to apprehension of danger of life, health, or limb.[5]

[¶52.] But even if there were legal support for Braveheart's forcible felony claim, the evidence at trial was factually sufficient to sustain the first-degree

---

4. We are assuming, without holding, that SDCL 22-18-4.5's "any unlawful act involving force or violence" text could be read to approximate the element of SDCL 22-32-19 that requires an intent to commit "any crime."
5. The State did not address Braveheart's prevention of a forcible felony theory of justification during its closing argument.

manslaughter conviction because the jury could have reasonably found that Braveheart could not have reasonably believed the use of deadly force was "necessary" under the circumstances of this case. *See* SDCL 22-18-4.1 ("A person is justified in using or threatening to use deadly force if the person *reasonably believes* that using or threatening to use deadly force is *necessary* to . . . prevent the imminent commission of a forcible felony." (Emphasis added)).[6]

[¶53.]     Carroll's cell phone video, alone, would support the inference that Braveheart shot Odom without justification. Though Odom had slapped Braveheart several times, the video and the consistent testimony of eyewitnesses establishes that Braveheart was not acting in self-defense when he shot the unarmed Odom who, by that point, had backed several steps away from Braveheart, raised his arms to his side, and said, "Shoot me." We therefore affirm Braveheart's conviction.

***Immunity and mootness***

[¶54.]     The provisions of SDCL 22-18-4.8 create criminal and civil immunity when "[a] person who uses or threatens to use force, as permitted in §§ 22-18-4 to 22-18-4.7, inclusive, is justified in such conduct[.]" In 2022, the Legislature amended SDCL 22-18-4.8 to clarify that the State in a criminal case may rebut and

---

6.     The statute also provides that a person is justified in using or threatening to use deadly force "to prevent imminent death or great bodily harm to himself," but Braveheart has not relied upon this theory of necessity on appeal. He did reference it in his reply brief, but this is not sufficient to place the issue before us. *See State v. Washington*, 2024 S.D. 64, ¶ 44 n.4, 13 N.W.3d 492, 505 n.4 (stating "it is well settled that a party may not raise an issue for the first time in the reply brief when the opposing party on appeal can no longer address it").

overcome a prima facie case of self-defense by clear and convincing evidence. *See also* 2022 S.D. Sess. Laws ch. 62, § 1.

[¶55.]     Having affirmed Braveheart's conviction, we must now consider whether the pretrial issue of immunity presents a continuing, live controversy which we can address through effectual relief. "A case is moot when the issue presented is academic or nonexistent and when 'judgment, if rendered, will have no practical legal effect upon the existing controversy.'" *Weiland v. Bumann*, 2025 S.D. 9, ¶ 40, 18 N.W.3d 148, 158 (quoting *Hewitt v. Felderman*, 2013 S.D. 91, ¶ 11, 841 N.W.2d 258, 262). An appeal becomes moot where "the actual controversy ceases and it becomes impossible for the appellate court to grant effectual relief." *Id.* (citation omitted). "A live controversy is a component of justiciability, constraining courts from offering solutions which are in search of problems." *SD Citizens for Liberty, Inc. v. Rapid City Area Sch. Dist. 51-4*, 2023 S.D. 57, ¶ 33, 997 N.W.2d 635, 642 (citing *Metro. Life Ins. v. Kinsman*, 2008 S.D. 24, ¶ 10, 747 N.W.2d 653, 658).

[¶56.]     Statutory immunity under SDCL 22-18-4.8, and generally, is both temporal and evanescent. Where it exists, a grant of immunity protects an individual from the burdens and uncertainty of a trial. *See Swedlund v. Foster*, 2003 S.D. 8, ¶ 12, 657 N.W.2d 39, 45 (noting that qualified immunity is more than a defense, it is "an entitlement not to stand trial or face the burdens of litigation"). But once the trial occurs, the purpose of immunity ceases to exist. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (noting immunity "is effectively lost if a case is erroneously permitted to go to trial" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985))).

[¶57.]    Indeed, it is for this reason that courts commonly seek to resolve questions of immunity at the earliest opportunity, to avert a trial for an individual who may be entitled to immunity. *Id.* (discussing "the importance of resolving immunity questions at the earliest possible stage in litigation" (citation omitted)). This view is often expressed in the context of supporting interlocutory review of trial court immunity decisions. *See Wood v. People*, 255 P.3d 1136, 1141 (Colo. 2011) (en banc) (noting that "because the purpose of statutory immunity is to spare the defendant the burden of trial, review of a pretrial 'make-my-day' determination should occur, if at all, prior to trial" and that intermediate review should be sought through an extraordinary writ); *Todd v. State*, 342 So. 3d 602, 612 (Ala. Crim. App. 2021) (explaining that defendant may challenge pretrial immunity determination by filing a writ of mandamus).

[¶58.]    Of course, individuals adversely impacted by a circuit court's SDCL 22-18-4.8 immunity decision, like Braveheart, also have the ability to petition for intermediate appeal. SDCL 23A-32-12. And if in the sound exercise of our discretion we grant the petition, we have an opportunity to correct an error in the circuit court's immunity ruling. However, a denial of the petition cannot be viewed as tacit approval of the immunity ruling. It means only that the showing was not sufficient to justify review.

[¶59.]    Given the ephemeral nature of immunity under SDCL 22-18-4.8, once a case proceeds to trial, the question of immunity becomes moot because we cannot grant effectual relief after the trial occurs and results in a final judgment. *See State*

*v. Bendel*, 2026 S.D. 35, ___ N.W.3d ___.[7] We cannot, in other words, transport the proceedings back in time to a point where guilt was undecided and the trial had yet to occur for the purpose of correcting an asserted error in the pretrial immunity proceeding. Indeed, to conclude otherwise would lead to a truly peculiar outcome under which a person who was found guilty by proof beyond a reasonable doubt could simultaneously be immune from the prosecution he just underwent.

[¶60.]        Consequently, Braveheart's challenge to the circuit court's immunity ruling is moot. We cannot overlook the fact that we have affirmed his conviction, and this final judgment prevents us from indulging an imprudent fiction that we could correct an alleged error from an immunity proceeding that has long since given way to the trial and finding of guilt.

### Conclusion

[¶61.]        The evidence, when viewed in the light most favorable to the State, is sufficient to support Braveheart's conviction. Though Odom repeatedly slapped Braveheart with his bare hands, the jury could have concluded that Braveheart engaged Odom unnecessarily and with disproportionate deadly force. The circuit court correctly denied Braveheart's motion for judgment of acquittal. And Braveheart's claim that the circuit court clearly erred when it denied his pretrial motion to dismiss on the basis of immunity has been rendered moot by a final judgment of conviction. We affirm.

---

7.    We also ordered supplemental briefing on the mootness question in *State v. Bendel*, 2026 S.D. 35, ___ N.W.3d ___. Our opinion in *Bendel*, issued today as well, identically holds that the question of immunity becomes moot with a final judgment of conviction.

#31107

[¶62.]     JENSEN, Chief Justice, and DEVANEY, MYREN, and GUSINSKY, Justices, concur.