#28450-r-DG
**2019 S.D. 14**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

MICHAEL BERT SWAN,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT L. SPEARS
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

GRANT FLYNN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


SCOTT R. BRATLAND
Watertown, South Dakota                 Attorney for defendant
                                        and appellant.

\* \* \* \*

ARGUED OCTOBER 3, 2018
OPINION FILED **03/13/19**

#28450

GILBERTSON, Chief Justice

[¶1.]        Michael B. Swan appeals his conviction for second-degree murder, arguing the circuit court abused its discretion by failing to instruct the jury on the lesser-included offenses of first- and second-degree manslaughter. Swan also claims the circuit court erred by denying his two motions for judgment of acquittal. We reverse and remand.

## Facts and Procedural History

[¶2.]        Sixty-three-year-old Swan and his wife, 77-year-old Angelina Swan, resided in an apartment in Milbank. At approximately 4:00 a.m. on October 24, 2016, Swan called his longtime friend Duane Pollock and claimed he was unable to wake Angelina. Pollock arrived at Swan's apartment within five minutes to check on Angelina, but was unable to detect a pulse. Pollock attempted to open Angelina's mouth and found that her jaw was locked shut. Pollock also noticed extensive bruising on Angelina's face and arms.

[¶3.]        Pollock contacted the Grant County Detention Center and requested an ambulance and the assistance of law enforcement. Milbank Police Officer Michael Morgan arrived at Swan's apartment at approximately 4:15 a.m. Officer Morgan observed that Angelina was cold, gray, stiff, and that her jaw was locked. He also noticed that Angelina had a black eye, bruising on the left side of her face and right hand, and blood in her nose. Officer Morgan contacted Milbank Chief of Police Boyd Van Vooren, who contacted the South Dakota Division of Criminal Investigation (DCI).

[¶4.]    DCI Special Agent Cameron Corey, along with Special Agents Jeff Kollars and Jeff Belon, investigated Angelina's death. Agent Corey conducted two interviews with Swan. Swan explained that on the afternoon of October 23, 2016, he and Angelina watched television for most of the day and had no visitors. Swan claimed that between 12:30 and 1:00 a.m., Angelina was lying in her chair and he told her she should go to bed. Swan stated that Angelina kicked her foot at him because she did not want to go to bed. In response, Swan claimed "he gave the bottom of her foot a pop." Swan then assisted Angelina to the bathroom and then to the bedroom, where he helped her lay down on an air mattress.

[¶5.]    Swan told Agent Corey that he and Angelina "squabbled after she had gone to bed, but that's all, just husband and wife after so much time, just squabbling." Swan also stated that "[w]e didn't really fight or anything like that, just squabbled." He claimed the couple was not "cursing at each other or anything like that. It did get a little vocal when I was taking her to bed saying just lay down, get some sleep. That's all."

[¶6.]    Swan claimed that after Angelina fell asleep, he sat at his desk and could hear her snoring. He also claimed that he checked on her periodically. Once when he checked on her, Swan stated Angelina had rolled off the air mattress, but she did not want Swan to help her back onto it. Swan continued watching television and checking on Angelina until at least 2:00 a.m. Around that time, Swan claimed he could no longer hear Angelina snoring, so he went to check on her again. Swan claimed that he found Angelina in the same position next to the air mattress, but that he was not able to wake her up. Swan said he began slapping

the side of Angelina's face but that she still would not wake up. He also claimed that he attempted to give Angelina mouth-to-mouth resuscitation. When that failed, Swan stated he called Pollock for help.

[¶7.] Minnehaha County Medical Examiner Dr. Kenneth Snell performed an autopsy the next day. Dr. Snell discovered that Angelina had suffered a severe atlanto-occipital dislocation (AOD), also known as an internal decapitation. Additionally, his examination found that Angelina had sustained two subdural hemorrhages, hemorrhaging to the sclera in both eyes, and several hemorrhages on her back where her ribs met her spine. Dr. Snell further noted bruising on Angelina's upper and lower eyelids and left cheek, as well as bruising on her abdomen, right buttock, right arm, right hand, right thigh, right knee, and inner left shin. Dr. Snell concluded that Angelina's death was caused by internal decapitation likely caused by someone stomping on her neck.

[¶8.] The State initially charged Swan with domestic simple assault, but amended the complaint to charge Swan with second-degree murder after receiving the autopsy results. Swan was indicted and a trial was held on September 11, 2017. Throughout the trial, Swan asserted that Angelina's death resulted from a fall. Swan denied that he and Angelina had engaged in a violent altercation.

[¶9.] Swan requested that the jury be instructed on the lesser-included offenses of first-degree and second-degree manslaughter. The State opposed the instructions, arguing there was no factual basis to support these offenses. The circuit court agreed with the State and denied the requested instructions.

[¶10.]    During trial, Swan orally moved for judgment of acquittal after the State rested its case, which the circuit court denied. Swan was convicted of second-degree murder. He then renewed his motion for a judgment of acquittal, but the circuit court denied his written motion as well. Swan was sentenced to life imprisonment. He appeals his conviction and sentence, asserting the following issues for our review:

1.    Whether the circuit court abused its discretion by refusing to instruct the jury on first- and second-degree manslaughter.

2.    Whether there is sufficient evidence in the record to support Swan's conviction of second-degree murder.

**Analysis & Decision**

*1. Whether the circuit court abused its discretion by refusing to instruct the jury on first- and second-degree manslaughter.*

[¶11.]    Swan argues he was entitled to lesser-included offense instructions on the second-degree murder charge on which he was convicted, including first- and second-degree manslaughter. Swan claims the circuit court abused its discretion by denying the proposed instructions. Specifically, Swan asserts there was sufficient evidence in the record to support his contention that he acted in the "heat of passion" in killing Angelina, thereby justifying an instruction on the charge of first-degree manslaughter under SDCL 22-16-15.

[¶12.]    Our standard of review of a circuit court's denial of a proposed jury instruction is well settled. *State v. Randle,* 2018 S.D. 61, ¶ 32, 916 N.W.2d 461, 469.

> We review a [circuit] court's refusal of a proposed instruction under an abuse of discretion standard. The trial court has broad

> discretion in instructing the jury. Jury instructions are satisfactory when, considered as a whole, they properly state the applicable law and inform the jury. Error in declining to apply a proposed instruction is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice.

*Id.* at 469-70 (quoting *State v. Shaw*, 2005 S.D. 105, ¶ 18, 705 N.W.2d 620, 625).

"An erroneous instruction is prejudicial if in all probability it produced some effect upon the verdict and is harmful to the substantial rights of the party assigning it." *Id.* at 470 (quoting *Shaw*, 2005 S.D. 105, ¶ 18, 705 N.W.2d at 625-26).

[¶13.] Swan was charged and convicted of second-degree murder. Second-degree murder is defined as a "[h]omicide . . . perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child." SDCL 22-16-7. Swan requested the jury be instructed on first- and second-degree manslaughter. First-degree manslaughter is a lesser-included offense of first- and second-degree murder. SDCL 22-16-20.1. Second-degree manslaughter is a lesser-included offense of first- and second-degree murder and first-degree manslaughter. *Id.* First-degree manslaughter is a "[h]omicide . . . perpetrated . . . (2) Without any design to effect death, including an unborn child, and in a heat of passion, but in a cruel and unusual manner[.]" SDCL 22-16-15(2). Second-degree manslaughter is "[a]ny reckless killing of one human being, including an unborn child, by the act or procurement of another which, under the provisions of this chapter, is neither murder nor manslaughter in the first degree, nor excusable nor justifiable homicide . . . ." SDCL 22-16-20.

[¶14.]     As to first-degree manslaughter, acting within the "'[h]eat of passion' is defined as an 'intent formed suddenly, under the influence of some violent emotion, which for the instant overwhelmed the reason of the slayer.'" *State v. Hart*, 1998 S.D. 93, ¶ 15, 584 N.W.2d 863, 865 (quoting *Graham v. State*, 346 N.W.2d 433, 434 (S.D. 1984)).  "Heat of passion" is further defined in the South Dakota Pattern Jury Instruction that Swan requested at trial:

> "Heat of passion" which will reduce a killing from murder to manslaughter in the first degree means a suddenly formed passion which was caused by reasonable and adequate provocation on the part of the person slain, causing a temporary obscurity of reason rendering a person incapable of forming a premeditated design to kill and which passion continues to exist until the commission of the homicide.
>
> "Heat of passion" is such mental disturbance or condition as would so overcome and dominate or suspend the exercise of the judgment of the defendant as to render his mind for the time being deaf to the voice of reason, make him incapable of forming and executing the distinct intent to take human life, and to cause him, uncontrollably, to act from impending force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition.  The sufficient provocation must be such as would naturally and reasonably arouse the passion of an ordinary person beyond his power to control.

SDPJI 3-24-26 (1996).

[¶15.]     Pursuant to SDCL 22-16-20.2, "[a] lesser included offense instruction shall be given at any homicide trial whenever any facts are submitted to the trier of fact which would support such an offense pursuant to this chapter."  When deciding to give the jury a lesser-included offense instruction, the circuit court must consider "whether there is *some* evidence to support giving the instruction." *State v. Waloke*, 2013 S.D. 55, ¶ 30, 835 N.W.2d 105, 114 (quoting *State v. Hoadley*, 2002 S.D. 109,

¶ 64, 651 N.W.2d 249, 264).  But "the question is not . . . whether there was *sufficient* evidence."  *Id.* (quoting *Hoadley*, 2002 S.D. 109, ¶ 64 n.14, 651 N.W.2d at 264 n.14).  "[W]hen a defendant's theory is supported by law and has some foundation in evidence, however tenuous, the defendant has a right to present it."  *Randle*, 2018 S.D. 61, ¶ 33, 916 N.W.2d at 470 (quoting *State v. Birdshead*, 2015 S.D. 77, ¶ 27, 871 N.W.2d 62, 73).

[¶16.]        Swan notes evidence in the record that he believes shows he acted in a heat of passion in killing Angelina, entitling him to a jury instruction for first-degree manslaughter.  Two of Swan's neighbors testified at trial that Swan and Angelina could be heard arguing or slamming doors almost daily.  Pollock's wife, Sandra Pollock, testified that Swan and Angelina drank beer and that Pollock took Swan to the liquor store to buy beer on almost a daily basis.  In Swan's interview with Agent Corey, Swan stated that he had been drinking alcohol and arguing with Angelina throughout the evening of October 23, 2016.  Swan revealed in the interview that he and Angelina had been "squabbling" and that Angelina had kicked Swan and he retaliated by clapping the bottom of Angelina's foot.  Swan also revealed that Angelina requested that he come into the bedroom to help her about a half-dozen times.  Angelina asked Swan to get her aspirin and water, to help her to the bathroom, to turn down the television, and to reposition her on the air mattress.  Swan also stated that Angelina was having trouble walking due to back pain earlier that day, and that he assisted her in getting around.  There is also evidence that Angelina may have been showing the early signs of dementia and that Swan had a history of high blood pressure.

[¶17.] Swan claims this evidence shows that he could have become increasingly frustrated with Angelina on October 23, 2016, and killed her in a heat of passion. He asserts this frustration was the result of Angelina's neediness and dependence on him, shown by her numerous requests for him to help her. Swan argues these details amount to at least "*some* evidence" that he may have killed Angelina in a heat of passion. *Waloke*, 2013 S.D. 55, ¶ 30, 835 N.W.2d at 114 (quoting *Hoadley*, 2002 S.D. 109, ¶ 64, 651 N.W.2d at 264). He therefore asserts that this evidence factually supports instructions on first-degree manslaughter. SDCL 22-16-20.2.

[¶18.] The State also appeared to advance the heat of passion theory in its closing arguments:

> What did happen? The truth of the matter is the defendant and Angelina Swan, they lived a miserable life. They fought and yelled at each other. They drank. That's all they did. The[ir] [neighbors] who had no interest in this case heard them screaming at each other constantly. The defendant admits he was—she was asking him for stuff constantly. He was annoyed. He was frustrated. She kept asking for things, bring me this, bring me that. He said it was like every five minutes. ["]I would go sit down and ten minutes later she would be asking me for something again.["] And you know what, she does probably have a sore back. She does maybe have some cognitive disabilities, maybe some memory loss. She's needy. She's dependent. She's becoming more and more dependent on this defendant all the time and he can't handle it. He gets fed up by it. And instead of helping her the way he should have, he grew angry and he started beating her up. I think with his foot, the foot you saw . . . [h]e's stomping on her. She's protecting herself. And he stomps on her neck and he ends her life. Maybe he didn't mean to, but he did. It's the only medical explanation that there is in this case.

[¶19.] At the very least, the evidence referenced by Swan certainly amounts to "any facts . . . which would support" first-degree manslaughter. SDCL 22-16-

20.2. There was at least "*some* evidence" presented to the circuit court that supported the possibility of a heat of passion killing. *Waloke*, 2013 S.D. 55, ¶ 30, 835 N.W.2d at 114 (quoting *Hoadley*, 2002 S.D. 109, ¶ 64, 651 N.W.2d at 264). Therefore, the circuit court abused its discretion in rejecting Swan's proposed instruction for first-degree manslaughter.∗

[¶20.] "If evidence has been presented which would support a conviction of a lesser charge, refusal to give the requested instruction would be reversible error." *State v. Williams*, 2008 S.D. 29, ¶ 34, 748 N.W.2d 435, 446 (quoting *State v. Heumiller*, 317 N.W.2d 126, 132 (S.D. 1982). There was evidence that entitled Swan to an instruction on the lesser-included offense of first-degree manslaughter, so we must reverse Swan's conviction for second-degree murder and remand for a new trial. Because we reverse and remand for a new trial on the issue of jury instructions for lesser-included offenses, we do not reach the issue of whether there

---

∗ Swan also argues he was entitled to an instruction on second-degree manslaughter. As noted above, second-degree manslaughter involves a reckless killing that is neither murder, first-degree manslaughter, nor justifiable homicide. SDCL 22-16-20. SDCL 22-1-2(1)(d) defines reckless as:

> import[ing] a conscious and unjustifiable disregard of a substantial risk that the offender's conduct may cause a certain result or may be of a certain nature. A person is reckless with respect to circumstances if that person consciously and unjustifiably disregards a substantial risk that such circumstances may exist[.]

Swan has presented no evidence that he acted recklessly by consciously and unjustifiably disregarding a substantial risk. The evidence presented only shows that Angelina's death was either the result of a fall or of a stomping to the neck. Therefore, Swan was not entitled to an instruction for second-degree manslaughter.

#28450

was sufficient evidence in the record to support Swan's conviction of second-degree murder.

[¶21.]     KERN, JENSEN and SALTER, Justices, concur.