#30927-a-PJD
**2026 S.D. 35**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JOSEPH PETER BENDEL,                    Defendant and Appellant.

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA

THE HONORABLE DAWN M. ELSHERE
Judge

BROOKLYN M. MAILEY
REBECCA MORLOCK REEVES
JUSTIN LARSON of
Austin, Strait, Benson, Thole & Koehn, LLP
Watertown, South Dakota                    Attorneys for defendant and
                                           appellant.

MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
RENEE STELLAGHER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
                                        appellee.

CONSIDERED ON BRIEFS
NOVEMBER 17, 2025
OPINION FILED **06/10/26**

#30927

DEVANEY, Justice

[¶1.] Joseph Bendel repeatedly beat his friend, Douglas Lindberg, Jr., with a board, causing a skull fracture, several broken bones, and other injuries. Lindberg died the next day. Prior to trial, Bendel filed a motion to dismiss the charges, alleging he was justified in using deadly force and was entitled to immunity from prosecution. The circuit court denied the motion and the case proceeded to a jury trial. The jury convicted Bendel of first-degree manslaughter. Bendel appeals, claiming the circuit court erred in denying his motion to dismiss and motion for judgment of acquittal and that the court abused its discretion when excluding testimony regarding the victim's alleged prior acts. We affirm.

**Factual and Procedural Background**

[¶2.] During the summer of 2023, Bendel often spent time hanging out with his friend, Lindberg, who he had known for 20 years. On the evening of August 19, Bendel went to Lindberg's house in Milbank and, after a night of drinking, stayed overnight. The next morning, the two started drinking again. At approximately 3:30 p.m. on August 20, Lindberg called Timothy Loehrer, who had been in a long-term relationship with Lindberg's grandmother, Margaret, before she passed away and was like a grandfather to Lindberg. Loehrer still lived in Margaret's farmstead home, located a short distance from Milbank, with the permission of the Lindberg family. At Lindberg's request, Loehrer took Lindberg and Bendel to a grocery store, where Lindberg purchased liquor, and Bendel purchased gas to fill a gas can. They then went to the farmstead where Loehrer lived so Bendel could help him fix a vehicle. Bendel and Lindberg continued to drink alcohol throughout the day.

-1-

[¶3.]    While Bendel worked on the vehicle, Lindberg tried to make a fire in the firepit in the front yard, as Loehrer sat nearby. Lindberg asked for something to light the fire and Bendel offered the gasoline he had purchased. As Bendel was walking toward the firepit with the gas can, Lindberg, without warning, came up behind Bendel and put him in what was described as a headlock or chokehold, causing Bendel to go down to the ground for a couple seconds. He then popped back up, telling Lindberg, "I can't believe you tried to choke me," to which Lindberg responded, "I didn't."[1]

[¶4.]    At that point, according to Loehrer, Lindberg took off running. Bendel grabbed a long two-by-four board that was on the ground nearby and chased after Lindberg with it, holding it in a striking position. Approximately 30 feet into the chase, Bendel swung at Lindberg but missed. He continued chasing Lindberg another 40 feet and swung again, this time striking Lindberg and causing him to stumble a bit. Lindberg ran away, with Bendel in pursuit. Bendel finally closed in and struck Lindberg a second time, knocking him to the ground. As Lindberg was lying on the ground, Bendel bent over him, beating him with the board approximately 12 to 15 times.

[¶5.]    Loehrer saw the entire series of events. He testified that, other than Lindberg's initial encounter with Bendel at the firepit when he put Bendel in a

---

1.    Both Loehrer and Bendel testified at trial regarding what transpired. It appears undisputed that Lindberg's action against Bendel was unprovoked and without warning. Bendel claimed he passed out from the chokehold. His account of what happened next, however, differs from Loehrer's. "[W]e restate the evidence and testimony in a light most favorable to the jury's verdict." *State v. Bolden*, 2024 S.D. 22, ¶ 2, 6 N.W.3d 238, 239 (citation omitted) (citation modified).

headlock, Lindberg did not have any physical contact with him again. When asked whether Lindberg tried to attack Bendel or physically come at him or touch him again, Loehrer responded "no."

[¶6.] After the beating ended, Loehrer was too scared to get closer, so he went to his vehicle and called 911, driving away from the farmstead as he spoke. During the call, which was logged at 6:12 p.m., Loehrer identified himself and provided his address, and requested law enforcement assistance. He said two people got in a fight and were "beating the hell out of each other." When asked by the 911 operator if the fight was still under way, Loehrer explained that "one kid beat the hell out of the other one. He's laying there in pretty bad shape." The operator confirmed that an ambulance would be sent. At that point, Loehrer's cellphone died.

[¶7.] Loehrer returned to the farmstead to check on Lindberg. Although he could not tell if Lindberg was breathing, Loehrer knew "he was in rough shape." As Loehrer walked back to his vehicle, Bendel approached him and asked him for a ride out of there. Loehrer, still shocked and "scared to death," agreed because he was afraid Bendel "would go bananas if [he] didn't." He feared for his own safety if he did not give Bendel a ride. At Bendel's request, he drove him to the nearby town of Big Stone City and dropped him off.

[¶8.] After Loehrer's 911 call, law enforcement responded to the farmstead, where they discovered Lindberg lying on the ground bleeding from his face and mouth. He was unresponsive and his breathing was extremely labored. Ambulance personnel rushed him to the hospital in Milbank, administering CPR along the way.

Lindberg was resuscitated two more times while in the ER, and the ER physician noted that both of his lungs were collapsed and air had escaped into his chest cavity, requiring the insertion of tubes. He showed multiple signs of trauma, including bruising on his body, swelling on his scalp and right shoulder, and a laceration by his left ear. X-rays revealed a fractured clavicle, fractured shoulder blade, and multiple broken ribs on both sides. His blood alcohol content level was .231%. Neurologically, he was not responsive and had indications of a severe brain injury. He was airlifted to a hospital in Sioux Falls, where he was diagnosed with a subdural brain hemorrhage and a skull fracture. As a result of his injuries, Lindberg died in the early morning hours of August 21.

[¶9.] Forensic pathologist Dr. Kenneth Snell conducted an autopsy. He determined that Lindberg was 5'9" tall and weighed 172 pounds. Dr. Snell noted injuries in multiple areas of his body, including bruising on his right forehead and the left side of his head near his eye and lacerations near his left ear. He also observed several separate bruises on the left and right sides of his back, as well as on the back side of his right forearm and hand, which Dr. Snell indicated could be a defensive wound. An internal examination of Lindberg's head revealed hemorrhages on both sides and a skull fracture on the left side. There was no injury to the back of his head. Additional injuries included pulmonary contusions and fractures to the ribs, clavicle, and shoulder blade. Dr. Snell determined there were a minimum of ten different sites of impact by a blunt object. He opined that the cause of death was traumatic brain injury due to assault, with pulmonary contusions contributing, and that the manner of death was homicide.

[¶10.] Law enforcement began investigating on the evening of August 20, and officers were actively looking for Bendel but did not find him that night. They later learned he had stopped at a couple houses, and then he made his way to a convenience store/casino, where he spent a couple hours drinking and playing video lottery until he was asked to leave. That night he slept under a bridge in Big Stone City.

[¶11.] The next morning, Special Agent Tasha Vohlken and Supervisory Special Agent Darin Sinner of the South Dakota Division of Criminal Investigation (DCI) interviewed Loehrer, who described what happened the day before and Bendel's attack on Lindberg. When asked, Loehrer claimed to not know how Bendel left the farmstead and denied giving him a ride. Later that day, DCI Special Agent Nate Winter had Loehrer come to the farmstead and do a walk-through, identifying potential evidentiary items and describing the locations where the events occurred. This included the path of Bendel's pursuit of Lindberg. SA Winter determined that, starting from the firepit area and ending at the blood-stained spot where Lindberg was found, Bendel had chased him approximately 50 yards.

[¶12.] That afternoon, law enforcement found Bendel under the bridge and took him into custody. SA Winter met him at the police department and Bendel agreed to speak with him. Bendel explained how he and Lindberg were drinking the day before and continued to drink at Loehrer's place where Bendel was helping fix a car. Bendel told SA Winter that at that point of the day, he and Lindberg were both pretty drunk, and his memory had started to get a little fuzzy. When SA Winter asked Bendel what happened, he explained that when Lindberg is

inebriated, he can get mean and that Lindberg was "roughhousing" him that day, yelling "fuck you" in a tone like he was horsing around. Bendel described how Lindberg was trying to start a fire in the firepit and when Bendel came to help him by bringing a gas can, Lindberg, out of nowhere, "choked him out." He told SA Winter they were "rolling around and scrapping" as he tried to get Lindberg off him. Bendel said he passed out, after which he was "irritated" and he asked Loehrer to take him to town. When SA Winter asked Bendel if what happened was horseplay between friends, he responded that he did not know, but he was irritated.

[¶13.] Given other information obtained during the investigation, it was apparent to SA Winter that Bendel had left out significant facts. Notably, Bendel never mentioned hitting Lindberg with any type of object. Bendel did not say that he was afraid of Lindberg or that he was in fear of imminent bodily injury or death. After the interview concluded, SA Winter took photographs of Bendel and did not see any evidence of physical injuries other than an old scab on Bendel's knee. SA Winter noted that Bendel was a large man. His driver's license identified his height as 6'4" and his weight as 240 pounds.

[¶14.] On August 22, SA Winter and SSA Sinner conducted a follow-up interview with Loehrer.[2] Loehrer again described the events that occurred on August 20. Based on what Bendel had said in his interview about Loehrer giving him a ride, the agents questioned Loehrer about this. Loehrer initially denied that he had, but eventually admitted giving Bendel a ride from the farmstead to Big

---

2. This interview, like Loehrer's interview the day before, was recorded. These recordings were offered by Bendel at trial and played for the jury.

Stone City. He became emotional, explaining that he had not told law enforcement previously because he was worried about what Lindberg's father would think of him for giving Bendel a ride to town. He indicated he was dependent on the Lindberg family, as he lived in their house, drove their vehicle, and had no job or money.

[¶15.] Bendel was indicted on charges of second-degree murder, two alternative counts of first-degree manslaughter, and two alternative counts of aggravated assault. Bendel filed a motion to dismiss the indictment pursuant to SDCL 22-18-4.8, asserting that he had acted in lawful self-defense and was entitled to statutory immunity.[3] His motion was accompanied by an affidavit in which he related his version of the events in question. The circuit court held an evidentiary hearing on the motion to dismiss and thereafter entered detailed findings of fact and conclusions of law, ruling that the State had produced clear and convincing evidence showing that Bendel was not acting in lawful self-defense. The court denied Bendel's motion to dismiss and scheduled the matter for a jury trial.

[¶16.] Both parties filed pretrial motions. Relevant here, the State filed a motion for an order compelling Bendel to specify any evidence he intended to offer

---

3.      SDCL 22-18-4.8 states, in pertinent part:

> A person who uses or threatens to use force, as permitted in
> §§ 22-18-4 to 22-18-4.7, inclusive, is justified in such conduct
> and is immune from criminal prosecution . . . .
> . . .
>
> In a criminal prosecution, once a prima facie claim of self-
> defense immunity has been raised by the defendant, the burden
> of proof, by clear and convincing evidence, is on the party
> seeking to overcome the immunity from criminal prosecution
> provided for in this section.

with respect to Lindberg's character traits under SDCL 19-19-404(a) (Rule 404(a)), or any other act evidence involving Lindberg under SDCL 19-19-404(b) (Rule 404(b)). The State also moved to exclude any evidence of Lindberg's criminal history or any testimonial evidence of Lindberg's "prior violent or threatening behaviors." At a pretrial status hearing, Bendel indicated his intent to introduce evidence of two prior incidents involving acts of violence by Lindberg. The court directed Bendel's counsel to specify these two incidents in writing and advised the parties that it would rule on the matter at the time of trial.[4]

[¶17.]     Prior to the start of trial, the State dismissed all charges except second-degree murder and first-degree manslaughter (heat of passion). The jury trial commenced on October 22, 2024. Before opening statements, the circuit court considered arguments from the parties and an oral proffer by Bendel's counsel with respect to the Rule 404(a) or Rule 404(b) evidence pertaining to Lindberg's character or other acts. The court entered an oral ruling allowing Bendel to present testimony regarding one of the prior incidents, but not the other. The court also ruled that it would allow Bendel to testify about his knowledge that Lindberg had been in prison.

[¶18.]     At trial, the State called law enforcement officers, the ER physician who treated Lindberg, Dr. Snell, and Loehrer, who described what happened at the farmstead on August 20 as recited above and was extensively cross-examined by Bendel's counsel. Bendel's case-in-chief included testimony from an ER physician

---

4.     The record does not contain any written submissions from Bendel regarding Lindberg's other acts that he sought to introduce at trial.

who explained typical effects of a chokehold and who offered his opinion that Lindberg died from the traumatic brain injury, not any of the other injuries. Bendel also called a former law enforcement officer who trains officers and others in personal combat, martial arts, and self-defense. He testified about the effects on a person who is choked from behind.

[¶19.] Bendel also testified. He explained that he was an alcoholic and often drank with his friend, Lindberg. He stated that when Lindberg had too much to drink, he had a tendency to act very erratically and do bizarre things. Bendel described an incident that occurred at his house on June 21, 2023, when Lindberg became belligerent so Bendel escorted him outside and told him to leave. Outside, Lindberg punched him in the face seven or eight times and Bendel pushed him back. When Lindberg stumbled, Bendel ran away from him. He said that Lindberg hit him hard enough that Lindberg's knuckles were injured as a result.

[¶20.] Bendel then testified about his version of what happened on August 20, 2023, starting with his drinking with Lindberg and the events throughout the day until they went to the farmstead where Loehrer resided. Bendel described his encounter with Lindberg, explaining that when he took the gas can over to the firepit to help start a fire, Lindberg, without provocation, jumped on his back and put him in a "stranglehold." He said he could not breathe and started to panic, as he tried to remove Lindberg but was not able to. Lindberg took him to the ground and Bendel believed at that point he lost consciousness. After coming to, he got to his feet and cursed at Lindberg, asking why he had done that to him. Bendel further testified that he turned to pick up the gas can and then Lindberg "darted" at

him from behind. Bendel said he faced Lindberg again, asked him what he was doing, and told Lindberg to leave him alone. According to Bendel, he again started to pick up the gas can and Lindberg darted at him a second time. He explained that, at that point, he grabbed a two-by-four board that was on the ground and swung at Lindberg, but did not hit him. Bendel testified that Lindberg started running away and he chased him about 50 yards until they reached tall grass and Lindberg stopped. Bendel testified that they stared and cursed at each other and he turned to walk away from Lindberg, thinking it was over. He said Lindberg then came running at him so he hit him with the board in the head and "a couple times" in the upper body and Lindberg fell to the ground. He testified that he continued to hit Lindberg "a few more times" while he was on the ground. Afterward, Bendel walked back to the house and saw Loehrer in his vehicle heading out of the driveway. He asked for a ride to town and Loehrer drove him to Big Stone City.

[¶21.] Bendel testified that, as he chased Lindberg, he was terrified and in shock because Lindberg was acting erratically. He explained that he was afraid for his life because Lindberg had put him in a chokehold and would not stop coming at him.

[¶22.] On cross-examination, Bendel acknowledged that his trial testimony was different from what he told law enforcement during his interview on August 21, 2023, and stated that his interview was "very inaccurate and incomplete in some aspects." He acknowledged he did not tell the agents that he hit Lindberg with the board, and he did not say that he was terrified, in fear of Lindberg, or that Lindberg kept darting at him. He admitted that, once he picked up the board, Lindberg had

no physical contact with him and, in fact, Lindberg took off running. He further admitted that, after he struck Lindberg and he fell to the ground, Bendel continued striking him at least nine more times.

[¶23.] Upon the close of the evidence, the jury was given several instructions, including instructions regarding self-defense and the justifiable use of deadly force. After deliberating, the jury found Bendel not guilty of second-degree murder and guilty of first-degree manslaughter (heat of passion). The circuit court later sentenced him to 60 years in the penitentiary, with 20 years suspended and credit for time served.

[¶24.] On appeal, Bendel raises the following issues, which we have restated:

1. Whether the circuit court erred when it denied Bendel's motion to dismiss on the grounds of statutory immunity.

2. Whether the circuit court abused its discretion by not allowing evidence of the victim's other acts.

3. Whether the evidence is sufficient to sustain the first-degree manslaughter conviction.

4. Whether Bendel was deprived of a fair trial due to cumulative errors.

## Analysis and Decision

### *1. Pretrial denial of statutory immunity*

[¶25.] Bendel argues that the circuit court erred when denying him immunity from prosecution. He claims the court erroneously interpreted and applied the statutes governing self-defense. He further argues the court erred by not considering his affidavit, and challenges the court's findings of fact, particularly the determination that Loehrer was credible. The State maintains that the circuit

court's determination of the facts was not clearly erroneous. Citing our ruling in *State v. Smith*, 2023 S.D. 32, ¶ 36, 993 N.W.2d 576, 588, the State further asserts that because a jury found that the State met its burden of proving Bendel's guilt beyond a reasonable doubt, thereby rejecting his self-defense claim, "there can be no harm" in the circuit court's earlier determination, based on a lesser burden of proof, that Bendel was not immune from prosecution.

[¶26.]     Prior to considering Bendel's arguments relating to the circuit court's pretrial order denying statutory immunity, we issued an order directing the parties to submit simultaneous supplemental briefs addressing the issue of "whether a claim of error relating to the pretrial immunity hearing under SDCL 22-18-4.8 becomes moot after a defendant is tried and ultimately convicted of the charge beyond a reasonable doubt."

[¶27.]     In Bendel's supplemental brief, he argues the issue is not moot, emphasizing that the matter of immunity under SDCL 22-18-4.8 is not just an affirmative defense, but a substantive right to be free from prosecution entirely. *See Smith*, 2023 S.D. 32, ¶ 34, 993 N.W.2d at 588. Bendel suggests that *State v. Tuopeh*, 2025 S.D. 16, 19 N.W.3d 37, established a precedent against a finding of mootness here, noting that *Tuopeh* was a post-conviction direct appeal in which we reviewed the merits of the circuit court's pretrial denial of statutory immunity under SDCL 22-18-4.8 and upheld the court's decision. *Id.* ¶ 53, 19 N.W.3d at 56. We note, however, that the issue of whether a pretrial ruling denying immunity is *moot* after a trial and judgment of conviction was not raised or addressed in either *Tuopeh* or *Smith*. Regardless, this Court may sua sponte raise and address the

question of mootness. *See Metzger v. Metzger*, 2021 S.D. 23, ¶ 10 n.1, 958 N.W.2d 715, 718 n.1.

[¶28.]     Bendel further points out that, after the circuit court's adverse pretrial immunity ruling, he filed a petition with this Court seeking permission to appeal the circuit court's order, but we denied his petition. He argues that if we determine that a pretrial denial of immunity is moot after a trial and conviction, he is effectively left without an avenue to appeal the circuit court's pretrial ruling. He then asserts, as he did in his petition for discretionary appeal, that he should have been afforded an appeal of right under SDCL 15-26A-3(2).

[¶29.]     In our order denying Bendel's petition, we rejected Bendel's argument that he has an appeal of right from the circuit court's order denying his motion to dismiss based on statutory immunity. "This Court has only such appellate jurisdiction as may be provided by the Legislature" and "the right to appeal is statutory and therefore does not exist in the absence of a statute permitting it." *Stoebner v. Konrad*, 2018 S.D. 47, ¶ 6, 914 N.W.2d 590, 593 (citation modified). Neither SDCL 22-18-4.8 nor SDCL 15-26A-3(2) provides a *right* to appeal a circuit court's pretrial order denying immunity. SDCL 22-18-4.8 is silent as to any route of appeal and SDCL 15-26A-3(2) only authorizes an appeal of right for an "order affecting a substantial right, made in any action, when such order in effect determines the action and prevents a judgment from which an appeal might be taken[.]" Here, the "action" in which the order was issued is the criminal proceeding, and the pretrial denial of immunity does not "determine" the action or prevent a judgment from being entered. Instead, the very same self-defense

asserted in a pretrial immunity motion can be asserted at trial and reassessed by the ultimate factfinder.

[¶30.] Contrary to Bendel's contention, this does not mean there is no avenue for appeal. Rather, SDCL 23A-32-12 affords a defendant a route to request an appeal from an order denying immunity from prosecution via a petition for intermediate discretionary review. If the petition identifies a possible error related to the order at issue, the inability of a defendant to obtain effective relief after a judgment of conviction is factored into our decision whether to grant an appeal. *See* SDCL 23A-32-12 (requiring a consideration of whether "the ends of justice will be served by the determination of the questions involved without awaiting the final determination of the action").

[¶31.] The question we posed to the parties here—whether a circuit court's denial of a defendant's motion to dismiss on statutory immunity grounds can be reviewed after the defendant has been tried and convicted—presents an issue of justiciability that we must address. It is well-established that we "will generally not rule on an issue if a decision 'will have no practical legal effect upon an existing controversy.'" *Netter v. Netter*, 2019 S.D. 60, ¶ 9, 935 N.W.2d 789, 791 (citing *Skjonsberg v. Menard, Inc.*, 2019 S.D. 6, ¶ 12, 922 N.W.2d 784, 787); *see Weiland v. Bumann*, 2025 S.D. 9, ¶ 40, 18 N.W.3d 148, 158 ("A case is moot when the issue presented is academic or nonexistent and when judgment, if rendered, will have no practical legal effect upon the existing controversy." (citation modified)). We have recognized that an issue on appeal is moot where there is no "live controversy" because "the actual controversy ceases and it becomes impossible for [this Court] to

grant effectual relief." *Weiland*, 2025 S.D. 9, ¶¶ 40−42, 18 N.W.3d at 158−59 (citation omitted); *see Melius v. Songer*, 2025 S.D. 51, ¶¶ 50−51, 25 N.W.3d 801, 817 (declining to reach the merits of a moot issue pertaining to a portion of a circuit court's order, where the Court's ruling "would have no practical or remedial effect").

[¶32.]        The relief afforded in SDCL 22-18-4.8 to defendants who have lawfully used or threatened to use force against another is immunity from a *criminal prosecution*. The statute defines "criminal prosecution" to include "arresting, detaining in custody, and charging or prosecuting the defendant."[5] Bendel acknowledges this point and asserts that "[i]mmunity as a substantive right is functionally lost if a case erroneously proceeds to trial." As we noted in *Smith*, the purpose of a circuit court's pretrial immunity decision under SDCL 22-18-4.8 is to determine whether a defendant is "subject to prosecution." *Smith*, 2023 S.D. 32, ¶ 30, 993 N.W.2d at 587. Once a circuit court determines that a defendant is not entitled to immunity from prosecution and the case proceeds to trial, any issue raised in a post-conviction appeal from a final judgment regarding the pretrial immunity ruling is moot. *See State v. Braveheart*, 2026 S.D. 36, ___ N.W.3d ___ (holding the same).[6] By that time, the harm the defendant was seeking to avoid—a criminal prosecution—has already occurred. It is therefore impossible for this

---

5.    Although SDCL 22-18-4.8 does not define the term "prosecution," Black's Law Dictionary broadly defines the term as "[a] criminal proceeding in which an accused person is tried." *Prosecution*, Black's Law Dictionary (12th ed. 2024).

6.    We also ordered supplemental briefing on the mootness question in *State v. Braveheart*, 2026 S.D. 36, ___ N.W.3d ___, which was submitted while this case was pending. Our opinion in *Braveheart*, issued today, identically holds that the question of immunity is rendered moot by a final judgment of conviction.

Court to grant Bendel the effectual relief he was seeking in his motion to dismiss. At this point, an opinion by this Court regarding the circuit court's pretrial ruling would be "a purely academic exercise[.]" *See Weiland*, 2025 S.D. 9, ¶ 41, 18 N.W.3d at 158 (citing *Hewitt v. Felderman*, 2013 S.D. 91, ¶ 12, 841 N.W.2d 258, 262). Courts in other jurisdictions have also determined that a trial court's pretrial denial of statutory immunity from prosecution under those states' statutes was rendered moot after the defendant proceeded to trial and was convicted by a jury. *See, e.g.*, *Wood v. People*, 255 P.3d 1136, 1141 (Colo. 2011); *Todd v. State*, 342 So. 3d 602, 606–08 (Ala. Crim. App. 2021).

[¶33.] Bendel alternatively asserts that even if we find this issue to be moot, we should nevertheless address it under an exception to the mootness doctrine. He asks us to apply the public interest exception, which requires that the following elements be met: "general public importance, probable future recurrence, and probable future mootness." *Larson v. Krebs*, 2017 S.D. 39, ¶ 16, 898 N.W.2d 10, 16–17 (citation omitted); *see State v. Bolton*, 2017 S.D. 94, ¶ 5, 906 N.W.2d 365, 366. We have recognized that "[a] question may be of public importance if it 'affects the legal rights or liabilities of the public at large.'" *Larson*, 2017 S.D. 39, ¶ 16, 898 N.W.2d at 17 (quoting *Boesch v. City of Brookings*, 534 N.W.2d 848, 850 (S.D. 1995)). Here, the circuit court's pretrial ruling denying Bendel statutory immunity from prosecution is a fact-specific determination that relates only to Bendel's case. It does not "affect the legal rights or liabilities of the public at large," and therefore, the public interest exception does not apply. *See Skjonsberg*, 2019 S.D. 6, ¶ 15 n.5,

922 N.W.2d at 789 n.5. Because this issue is moot and the public interest exception is inapplicable, we therefore decline to review it.

### 2. Other acts

[¶34.]    "This Court reviews evidentiary rulings for abuse of discretion." *State v. Rouse*, 2025 S.D. 29, ¶ 24, 23 N.W.3d 467, 475. "An abuse of discretion is defined as a 'fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration is arbitrary or unreasonable.'" *Id.* (citation omitted). "In order to justify relief on appeal, an evidentiary error 'must also be shown to be prejudicial.'" *Id.* (citation omitted). An error is prejudicial if there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *Id.* (alteration in original) (quoting *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686).

[¶35.]    On the first day of trial, prior to opening statements, the court addressed the matter of the other act evidence Bendel was seeking to introduce at trial, including evidence of the June 21, 2023 assault by Lindberg against him, and Bendel's awareness that Lindberg had been in prison in the past. Bendel's counsel further requested that Bendel be allowed to testify about Lindberg's alleged other acts occurring on July 28, 2023. In an oral offer of proof, counsel stated that on that date, Lindberg came back from an event called Farley Fest and told Bendel that he had just broken into a house and brought home some beer and groceries that he had stolen. Lindberg left and came back later, telling Bendel that he was in a garage stealing a motorcycle and a guy chased him out. Lindberg left a third time, and when he returned, he told Bendel he had been in a fight, stating, "I got beat up,

where's my knife, I'm going to go kill those guys." Lindberg left again. When he came back, he had been injured and beaten up and again made threats about "getting these people." Bendel's counsel argued that these incidents reflected Bendel's awareness of violent, bizarre behavior on Lindberg's part and were thus relevant to Bendel's defense. Counsel also stated that the evidence would be presented through Bendel's testimony.

[¶36.] The circuit court ruled that Bendel would be permitted to testify about the June 21 assault, as well as his knowledge that Lindberg had been in prison. As to the July 28 incidents, the court denied the request after finding the incidents were not probative in this case. The court also stated it had weighed the evidence and determined it was more prejudicial than probative, noting that the proffer related to incidents "where obviously the victim's not here and you're providing all that as hearsay[.]" Later during trial, Bendel renewed his request to testify about the July 28 incidents, arguing again that his awareness of Lindberg's threats was relevant to his state of mind with respect to the depraved mind element of the second-degree murder charge, as well as his self-defense claim. The court stood by its earlier ruling, noting it had weighed the prejudicial effect of the hearsay. Consistent with the court's rulings, during his case-in-chief, Bendel testified about Lindberg's June 21 assault against him, and further testified that Lindberg told him "he had been in and out of prison the majority of his adult life."

[¶37.] On appeal, Bendel contends the circuit court abused its discretion by not allowing him to testify about Lindberg's other acts on July 28. He argues the evidence is relevant because his "knowledge of [Lindberg's] tendencies to engage in

illegal and violent behavior made it more probable that the force [he] used . . . was reasonable and necessary to protect himself." Citing *State v. Cottier*, he argues the evidence of Lindberg's acts was admissible to demonstrate his state of mind. *See* 2008 S.D. 79, ¶ 33, 755 N.W.2d 120, 133 (holding, in a case involving a self-defense claim, that evidence of "a victim's specific acts may be admissible to demonstrate a defendant's state of mind, but only if the acts were known to the defendant at the time of the offense").

[¶38.] Bendel cites Rule 404(b), which precludes the admission of other act evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but allows such evidence to be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[7] A party seeking to introduce other acts under Rule 404(b) "must present sufficient evidence for a jury to conclude by a preponderance of the evidence 'that the other acts occurred and that the [person] was the actor.'" *State v. Otobhiale*, 2022 S.D. 35, ¶ 25, 976 N.W.2d 759, 769.

---

7. On appeal, Bendel also cites SDCL 19-19-405(b), which is perhaps more directly on point here. This rule states: "When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct." We have cited SDCL 19-12-7, the predecessor to Rule 405(b), when noting that specific incidents showing an alleged victim's prior violent behavior *known to a defendant* may be used to support a self-defense claim to show a defendant's fear was reasonable. *See e.g.*, *State v. Knecht*, 1997 S.D. 53, ¶ 15, 563 N.W.2d 413, 419. Bendel did not, however, cite this rule when making his arguments to the circuit court. But more importantly, he did not offer any arguments or authority to support the admission of this evidence of Lindberg's specific instances of conduct via hearsay.

[¶39.] Here, Bendel did not seek to introduce evidence of Lindberg's alleged other acts involving fights, thefts, or break-ins by having the individuals who may have been the subject of those incidents testify that they occurred and that Lindberg was the actor. Rather, as Bendel's counsel explained on the first day of trial, the request was for *Bendel* to be permitted to testify about what he claims Lindberg *told him*. As the circuit court correctly ruled, such testimony constitutes hearsay, which is not admissible unless otherwise permitted by statute or rule. *See* SDCL 19-19-801(c), -802.

[¶40.] Although the circuit court made it clear that its primary basis for excluding this evidence was that it was hearsay, Bendel did not argue below that the evidence he sought to introduce was not hearsay or that it should be admitted pursuant to any exception to the hearsay rule; nor does he address hearsay in his initial appellate brief in any manner. Only in his reply brief does Bendel argue, for the first time, that the evidence does not constitute hearsay because it was not offered to prove the truth of what Lindberg told him about fights, thefts, break-ins, and threats. Rather, he now claims it "was intended to show knowledge of [Lindberg's] statements he believed to be true[.]" He also argues in his reply brief that even if the evidence is hearsay, it is admissible under SDCL 19-19-804, the rule permitting the introduction of hearsay when the declarant is unavailable under certain circumstances.

[¶41.] We decline to review an issue not raised before the circuit court. *See* *State v. Fideler*, 2023 S.D. 25, ¶ 22 n.5, 992 N.W.2d 19, 25 n.5 (citing *State v. Podzimek*, 2019 S.D. 43, ¶ 27, 932 N.W.2d 141, 149) (providing that "ordinarily an

issue not raised before the circuit court will not be reviewed at the appellate level" (citation modified)).  Additionally, "it is well settled that a party may not raise an issue for the first time in the reply brief when the opposing party on appeal can no longer address it."  *State v. Washington*, 2024 S.D. 64, ¶ 44 n.4, 13 N.W.3d 492, 505 n.4 (declining to consider an argument presented for the first time in the reply brief).  We thus decline to consider Bendel's newly raised arguments seeking to counter the circuit court's hearsay ruling.  Not only did he fail to present them to the circuit court and in his opening appellate brief, he also fails to explain how any of the exceptions under SDCL 19-19-804(b) have been established which would have allowed admission of the evidence.

[¶42.]          Based on the record Bendel made below, the circuit court did not abuse its discretion when it precluded Bendel from testifying about alleged thefts and break-ins, which were not probative to a self-defense claim, nor did the court abuse its discretion when precluding testimony regarding threats Lindberg allegedly made to harm unidentified individuals on July 28.  Although he recharacterizes his arguments now, Bendel's argument to the circuit court that these threats were violent and threatening conveyed an intent to offer them for the truth of the matters asserted.  Moreover, even if we were to consider Bendel's newly raised arguments on appeal and conclude that the testimony was probative nonhearsay evidence relevant to the effect the statements had on Bendel, the danger of unfair prejudice substantially outweighing the probative value, given the unavailability of the person alleged to have made these threats, still remains.  In any event, Bendel has failed to show that the exclusion of this testimony prejudiced him such that

there is a reasonable probability the result of the trial would have been different had the court ruled differently. *See Rouse*, 2025 S.D. 29, ¶ 24, 23 N.W.3d at 476.

[¶43.]     Bendel was permitted to testify about Lindberg's actual assault upon him on June 21, in which Lindberg punched him in the face numerous times, as well as the fact that Lindberg had been in prison. Bendel further testified that when Lindberg had too much to drink, "[h]e had a tendency to be very erratic and kind of just do some bizarre things. . . . I mean, there's times that I had been at his house and just out of nowhere he would be throwing furniture and yelling stuff and I would just be like, oh, Doug's going crazy, I'm outta here." All this testimony was provided for the same reasons Bendel argues here—to attempt to explain why he reasonably believed deadly force was necessary when he was confronted with violent and erratic behavior by Lindberg. The jury heard all of that testimony, as well as strong evidence that Bendel's use of deadly force—repeated blows with a board to a much smaller, unarmed man who had run away from him—was not justified and was excessive, and found him guilty. Additional testimony by Bendel regarding alleged threats Lindberg may or may not have made to harm unidentified individuals a month prior would not have altered that outcome.

### 3.     *Sufficiency of the evidence*

[¶44.]     Bendel claims the court erred by denying his motion for judgment of acquittal at the close of the evidence. We have held that "a motion for judgment of acquittal attacks the sufficiency of the evidence." *State v. Timmons*, 2022 S.D. 28, ¶ 14, 974 N.W.2d 881, 886 (citation modified). "A question regarding the sufficiency of the evidence to sustain a conviction is reviewed de novo." *State v. Ahmed*, 2022

S.D. 20, ¶ 14, 973 N.W.2d 217, 221 (quoting *State v. McReynolds*, 2020 S.D. 65, ¶ 11, 951 N.W.2d 809, 814). "In measuring the sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Hillyer*, 2025 S.D. 30, ¶ 21, 23 N.W.3d 782, 789 (citation omitted). We "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* (citation omitted). "Instead, 'we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict.'" *Id.* (citation omitted). "If the evidence, including circumstantial evidence and reasonable inferences drawn therefrom[,] sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *State v. Peltier*, 2023 S.D. 62, ¶ 24, 998 N.W.2d 333, 341 (citation omitted). Moreover, we have held that "sufficiency of the evidence is not tested solely on the State's case-in-chief" but "we look at the evidence as a whole[.]" *Id.* ¶ 25, 998 N.W.2d at 341 (considering evidence from both the State's and the defendant's witnesses when upholding the sufficiency of the evidence).

[¶45.] Bendel was convicted of first-degree manslaughter under SDCL 22-16-15(2), which required the State to prove Bendel killed Lindberg "[w]ithout any design to effect death . . . and in a heat of passion, but in a cruel and unusual manner." Additionally, "[w]hen a homicide defendant raises self-defense or justification, the State must prove beyond a reasonable doubt that the killing was without authority of law." *State v. Bolden*, 2024 S.D. 22, ¶ 41, 6 N.W.3d 238, 247 (citation omitted). "Whether, under the particular facts of each case, homicide was

justified is for the jury to decide." *State v. Frias*, 2021 S.D. 26, ¶ 29, 959 N.W.2d 62, 70 (citation omitted).

[¶46.] The essence of Bendel's claim on appeal is that there was insufficient evidence to prove: (1) that he acted in a heat of passion, and (2) that his actions were not justified. We have explained that "'[h]eat of passion' is defined as an 'intent formed suddenly, under the influence of some violent emotion, which for the instant overwhelmed the reason of the slayer.'" *State v. Swan*, 2019 S.D. 14, ¶ 14, 925 N.W.2d 476, 479–80 (quoting *State v. Hart*, 1998 S.D. 93, ¶ 15, 584 N.W.2d 863, 865). In *Swan*, we recognized additional definitions, as found in the pattern jury instruction given in that case:

> "Heat of passion" which will reduce a killing from murder to manslaughter in the first degree means a suddenly formed passion which was caused by reasonable and adequate provocation on the part of the person slain, causing a temporary obscurity of reason rendering a person incapable of forming a premeditated design to kill and which passion continues to exist until the commission of the homicide.
>
> "Heat of passion" is such mental disturbance or condition as would so overcome and dominate or suspend the exercise of the judgment of the defendant as to render his mind for the time being deaf to the voice of reason, make him incapable of forming and executing the distinct intent to take human life, and to cause him, uncontrollably, to act from impending force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition. The sufficient provocation must be such as would naturally and reasonably arouse the passion of an ordinary person beyond his power to control.

*Id.* ¶ 14, 925 N.W.2d at 480 (quoting South Dakota Pattern Jury Instruction (Crim.) 3-24-26). The jury was provided this pattern instruction in this case.

[¶47.] The jury heard evidence at trial that Lindberg unexpectedly came up behind Bendel and put him in a chokehold, causing him to briefly lose consciousness. The evidence, when viewed in a light most favorable to the State, showed that Lindberg's actions prompted Bendel to grab the board and chase Lindberg the distance of half a football field, hitting him once along the way. When Bendel caught up to Lindberg, he struck him again with the board, knocking him to the ground, and continued to viciously beat him—between 12 to 15 times—until he was obviously severely injured and helpless. Bendel beat Lindberg with such force that he fractured Lindberg's skull, clavicle, shoulder blade, and multiple ribs. Based on our review of the evidence as a whole, we determine that a rational jury could have found that Bendel was acting in a heat of passion.

[¶48.] With respect to his further claim that he was justified in using deadly force, Bendel contends that the statutes governing self-defense enacted in 2021 "do not limit the amount of force used or require force be used only when necessary to stop danger." He further asserts that the current statutes require only that the "specific person" has a "reasonable belief that force is necessary." Neither interpretation of the governing statute is sound.

[¶49.] The justifiable use of deadly force is defined in SDCL 22-18-4.1. That statute reads, in its entirety:

> A person is justified in using or threatening to use deadly force if the person *reasonably* believes that using or threatening to use *deadly force is necessary* to prevent imminent death or great bodily harm to himself, herself, or another, or to prevent the imminent commission of a forcible felony.
>
> A person who uses or threatens to use deadly force in accordance with this section does not have a duty to retreat and has the

right to stand his or her ground, if the person using or
threatening to use the deadly force is:

(1)     Not engaged in a criminal activity; and
(2)     In a place where the person has a right to be.

SDCL 22-18-4.1 (emphasis added).[8]  For purposes of this statute, a forcible felony is

defined as "arson, assault, burglary, kidnapping, manslaughter, murder, rape, and

robbery, and any other felony that involves the use of or the threat of physical force

or violence against a person[.]"  SDCL 22-18-3.1(3).

[¶50.]          Bendel's argument that SDCL 22-18-4.1 employs a subjective rather

than an objective standard is misplaced.  His interpretation of the statute ignores

the significance of the reference to what the person "reasonably" believes.  As

written, the statute refers to an objective standard.  In this respect, the language in

SDCL 22-18-4.1 is not significantly different than SDCL 22-16-35, repealed in 2021,

which stated that "[h]omicide is justifiable if committed by any person in the lawful

defense of such person . . . if there is *reasonable* ground to apprehend a design to

---

8.      SDCL 22-18-4.1 was enacted in 2021 as part of the same bill creating SDCL
        22-18-4.8.  *See* 2021 S.D. Sess. Laws ch. 93.  At the same time, the
        Legislature repealed the statutes governing justifiable homicide, SDCL
        22-16-34 and 22-16-35.  *See id.* §§ 14−15.  The Legislature also amended
        SDCL 22-18-4, which pertains to the use of *non-deadly* force and similarly
        states:

> A person is justified in using or threatening to use force, *other*
> *than* deadly force, against another if the person reasonably
> believes that using or threatening to use force is necessary to
> defend against the other's imminent use of unlawful force.
>
> A person who uses or threatens to use force in accordance with
> this section does not have a duty to retreat before using or
> threatening to use force.

(Emphasis added.)  *See* 2021 S.D. Sess. Laws ch. 93, § 2.

commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished." (Emphasis added.) Both statutes refer to the reasonableness of the person's "ground" or belief that deadly force was necessary. When addressing what is required by this "reasonable person" standard, we have explained that "[w]hen a defendant claims justifiable homicide because he was threatened with serious bodily injury, the responding 'force becomes limited to that which is reasonable in the circumstances, and, as the threat of harm dissipates, so does the reasonableness of the force used.'" *Cottier*, 2008 S.D. 79, ¶ 13, 755 N.W.2d at 127 (citing *State v. Jaques*, 428 N.W.2d 260, 265–66 (S.D. 1988) (rejecting a defendant's argument that "[r]ather than an objective 'reasonable person' standard, . . . in cases involving threatened homicide or serious bodily injury, a defendant may respond with 'whatever force he deems necessary'")); *see State v. Luckie*, 459 N.W.2d 557, 560 (S.D. 1990) (upholding the trial court's self-defense instruction setting forth an objective "reasonable person" standard).

[¶51.] Furthermore, it is apparent from the language in SDCL 22-18-4.1 that the Legislature has determined a person may use deadly force only in certain, specific circumstances. Notably, the person must reasonably believe that *deadly force* is *necessary to prevent* imminent death or great bodily harm, or *to prevent* the imminent commission of a forcible felony. The statute does not authorize the use of deadly force solely in response to, or in retaliation for, a *past* event.

[¶52.] In his brief, Bendel contends that his use of force was justified because it was in response to "being the victim of multiple unprovoked attacks by [Lindberg]." He cites his trial testimony in support of this claim. But it is evident

the jury rejected Bendel's testimony in this regard and accepted the testimony of Loehrer, who explained that Lindberg never came at Bendel again after the initial chokehold and was running away from him when Bendel attacked him with the board. The jury also heard evidence that when Bendel was interviewed about the incident the day after it occurred, he did not tell SA Winter that Lindberg attempted to attack him multiple times or that he acted out of self-defense or fear of imminent bodily injury or death. The evidence was sufficient to support the jury's finding that Bendel's killing of Lindberg was not justified.

### 4. *Cumulative error*

[¶53.]     Bendel asserts that he was denied his constitutional right to a fair trial due to the cumulative effects of trial errors by the circuit court. We have recognized that "[t]he cumulative effect of errors by the trial court may support a finding by the reviewing court of a denial of the constitutional right to a fair trial." *State v. Taylor*, 2020 S.D. 48, ¶ 51 n.7, 948 N.W.2d 342, 357 n.7 (citation omitted). But a "cumulative error" argument obviously fails absent a determination that there were, in fact, prejudicial errors that occurred at trial. *See id.* Bendel cites the alleged errors presented in the above issues, as well as three additional claimed errors, none of which would warrant a new trial. With respect to the former, we have already determined that no error or prejudice exists. Of the additional claims, we address only one.

[¶54.]     Bendel claims that the court, after imposing a penitentiary sentence, told Bendel that "you will be parole eligible pursuant to SDCL 24-15A-32." Bendel asserts this is erroneous because under recently enacted SDCL 24-15-4.1, an inmate

who is sentenced for first-degree manslaughter is not eligible for parole. Bendel

argues the court "mistakenly incorporated parole eligibility into his sentence." It is

true that Bendel is ineligible for parole under that statute. However, the court's

comment, even if mistaken, does not mean that parole eligibility became a part of

the sentence imposed. "Indeed, parole eligibility could *not* be part of a judicial

sentence because parole is not a judicial power: it is an executive act." *Madetzke v.

Dooley*, 2018 S.D. 38, ¶ 13, 912 N.W.2d 350, 355 (emphasis added) (citation

omitted). Moreover, an erroneous statement regarding parole eligibility would not

warrant a remand for a new trial, as Bendel requests.

[¶55.]       Further, it is not clear that the reference to parole eligibility was even

part of the court's sentencing analysis. Read in its proper context, the sentencing

transcript reveals that the court first determined and stated Bendel's sentence

before then making a passing reference to parole eligibility after giving a general

admonition to follow the rules imposed by the Department of Corrections:

> So taking that all into account, it will be the judgment of the
> [c]ourt in this matter that you serve a sentence in the State
> penitentiary of 60 years. I'm going to suspend 20 of those years
> on the condition that you pay court costs, that you reimburse for
> the cost of your court-appointed attorneys fees. I will give you
> credit for the 395 days that you have served in this matter.
> You'll need to follow all the rules and regulations of the
> Department of Corrections and you will be parole eligible
> pursuant to SDCL 24-15A-32, but you will be remanded to the
> custody of the sheriff for your transportation to the State
> penitentiary.

[¶56.]       For all the reasons explained in this opinion, Bendel was not deprived

of a fair trial, as he "has failed to demonstrate any error that was prejudicial to him,

either on its own or on a cumulative basis." *Taylor*, 2020 S.D. 48, ¶ 51 n.7, 948 N.W.2d at 357.

[¶57.]     We affirm.

[¶58.]     JENSEN, Chief Justice, and SALTER and MYREN, Justices, concur.

[¶59.]     KERN, Retired Justice, concurs in part and dissents in part.

[¶60.]     GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

KERN, Retired Justice (concurring in part and dissenting in part).

[¶61.]     I agree with the entirety of the majority's decision affirming Bendel's conviction for first-degree manslaughter. However, due to the circuit court's incorrect statement during Bendel's sentencing, I would remand for resentencing.

[¶62.]     The circuit court sentenced Bendel to 60 years in the penitentiary, with 20 years suspended. When imposing that sentence, the court stated, "you will be parole eligible." Pursuant to SDCL 24-15-4.1, however, an inmate convicted of and sentenced for first-degree manslaughter is *not parole eligible*. While I agree that the court's incorrect statement does not necessitate a new trial, in my view, resentencing is warranted.

[¶63.]     While parole eligibility is not part of Bendel's formal sentence, it is a factor courts can and do take into consideration when determining an appropriate sentence. *See, e.g.*, *State v. Cadwallader*, 434 N.W.2d 506, 510 (Neb. 1989). In *Cadwallader*, the Supreme Court of Nebraska explained:

> In fixing the term of imprisonment, a trial court has a number of matters to consider. The sentence should be such as to provide some deterrence; of sufficient length to at least afford a

possibility of rehabilitation; of sufficient severity so as not to depreciate the seriousness of the crime; and, in a proper case, such as to provide some measure of protection to society by removing the offender temporarily from society. *It would be strange to think that a sentencing judge could make a decision as to a proper term of imprisonment if no consideration were given to the various factors that determine how much of a particular sentence must be served before the prisoner can be released.*

*Id.* (emphasis added); *see also State v. Goble*, 4 N.W.3d 700, 705 (Iowa 2024) ("Sentencing courts can and should be mindful of parole.").

[¶64.] Here, when announcing its sentence, the circuit court stated incorrectly that Bendel would be eligible for parole. As a result, it is impossible to know whether the court's mistaken assumption that Bendel was parole eligible played a role in its sentencing decision. While the Court must be mindful of the need for finality and the effect that resentencing may have on the victim's family, we must temper those considerations with some degree of certainty that the court was fully and correctly informed of all factors affecting its sentence. I would, therefore, remand for resentencing.